(No. 6252.   October 3, 1935.)

ORA DAVIS HILLMAN, Widow, and RICHARD HILLMAN, BEVERLY JEAN HILLMAN and JOY HILLMAN, Minors, by Their Natural Guardian, ORA DAVIS HILLMAN, Mother, Respondents, v. UTAH POWER & LIGHT COMPANY, Employer, and STATE INSURANCE FUND, Surety, Appellants.

[51 Pac. (2d) 703.]

68

Finis Bentley and P. C. O'Malley, for Appellants.

Merrill & Merrill, for Respondents.

AILSHIE, J.—The Utah Power & Light Company, one of the appellants herein, maintained and operated an electric generator and distributing plant at Alexander in Caribou County. Daniel A. Hillman, now deceased, was employed by the company as second operator at the plant; his working shift was from 3 o'clock P. M. until 11 P. M. He lived with his family in a house belonging to the company and near the plant. Hillman worked alone. On November 27, 1933, he went on shift as usual. His wife took his dinner to him at the plant about 5 o'clock. He returned home at 11 o'clock P. M. and ate a bowl of cereal, as was his usual custom, and then retired. No complaint of any injury was made at that time. The next day being his day off, he arose at 10 A. M. and about 2 o'clock in the afternoon, in company with his wife, went to Grace, Idaho. They attended to some business there in the afternoon and in the evening went home and had their dinner and later returned to Grace, where they spent the evening with friends and played cards until about 11 o'clock, at which time refreshments were served, and while being served Hillman complained of "feeling kind of funny" and went outdoors for a few minutes. He suffered a great deal of pain and complained of feeling "faint and weak," and his wife thereupon took him home in their car. She called a doctor and about 4 o'clock in the morning another doctor came and administered an anesthetic to induce sleep. Later in the morning a doctor was again summoned and the patient was taken to a hospital at Soda Springs. An X-ray was taken and the doctors agreed that it was a case of "acute pancreatitis," a condition which required an immediate operation. Upon operating they found a ruptured spleen and a great quantity of clotted blood. Later peritonitis de-

veloped and Hillman died about 11:30 P. M. December 5, 1933.

It appears that the station or operating-room, which was maintained in the power company's plant where Hillman worked, contained a desk, meters, instrument boards, etc., and a "regulator panel" made of slate, about 4 inches thick and projecting out from a switch board a distance of about 15 inches; the lower edge of this was 41½ inches from the floor. It was a part of the duty of the operator on the night shift to mop out the place from time to time, and one Lotz, who worked on the day shift as first operator, testified that he had struck himself there two or three times against the sharp end of the panel. However, there was no evidence that Hillman mopped the place that night. It appears that this panel would strike one of the height of Lotz and Hillman, rising from a stooping position, at about the place on the body at which the evidence discloses a bruised or contused spot was found on Hillman's body.

It seems to be well established by the evidence of the physicians that Hillman had in some way received a considerable blow immediately over the spleen, which left a discolored or contused spot about the size of a half-dollar. It is also undisputed that when the surgeons operated they found the spleen ruptured and great quantities of clotted blood, which had been collecting for some period of time. It was the opinion of the physician that the blow had either caused a direct rupture of the spleen or that a very slight rent or tear in the friable capsule enclosing the spleen occurred as a result of the blow or a rupture, wholly within the spleen without tearing the capsule, and thus produced a hemorrhage inside the spleen which continued until such a quantity of blood collected that it resulted in bursting the capsule; and that in the latter case the condition might have existed for one, two or three days before the patient "became decidedly ill."

On December 18th the widow of deceased filed her claim with the State Insurance Fund and the same was received by the Accident Board on January 5th. April 17, 1934, hearing was held by the board and an award was made to

respondents followed by an amended award. On appeal to the district court the order of the board was affirmed, both as to the original and the amended award. From the judgment of the district court defendants have appealed.

Seven assignments of error are made: that the board and court erred in holding that respondents were entitled to the two awards; in not making specific and definite findings; that the findings of fact and rulings of law are insufficient to support the awards; that the board and court erred in admitting hearsay and incompetent evidence and in relying upon same as a basis for the awards; that the evidence is insufficient and incompetent to support the awards and that the court erred in affirming the award. Complaint is made of the narrative and evidentiary character of the findings and their lack of definiteness as to specific facts established by the evidence. The criticism is not without merit. However, in view of the conclusions we have reached, we do not deem it important to further notice this particular objection.

Dr. Zaring, the surgeon who operated on Hillman, testified as follows:

"Q. Did you make inquiry of the patient as to anything that may have caused this condition?

"A. Yes.

"Q. When was that?

"A. That was either the next day or the second day, and I cannot say positively.

"Q. And who was present?

"A. The nurse was there.

· · · · · · · · · · · ·

"Q. What did you say to him and what did he say to you?

"A. And I says, 'Dan, I don't see how you could have had all that trouble in your abdomen without an injury,' and he said, 'Well, I did have an injury,' and I said, 'What was it?' and he said, 'I was struck.'

· · · · · · · · · · · ·

"A. I asked him what the injury was, and he said he had struck his side. I understood it at the time as projector

panel, but I suppose he said regulator panel, and I asked him if it seemed to hurt him much at the time, and he says, 'Oh, it hurt for a little,' and he soon forgot about it, and, incidentally, did not mention it to me in connection with his illness, and that was about all I asked of him because, as I say, it was very soon after the operation and he was—

. . . . . . . . . . . .

"Q. Now, did you examine his body, doctor, on the outside to determine whether there were any contusions?

"A. Yes.

"Q. When did you make that examination?

"A. At the time he told me about that injury.

"Q. And what did you find then on his body?

"A. Why, I found a very slightly discolored area as large as half a dollar, or perhaps a little larger, at the base of his left chest, to the side and just a little bit back.

"Q. Whereabouts was that contusion on his body with reference to the location of the spleen?

"A. Well, it was in rather close contact, that is, in close relation to the position of the spleen."

The nurse testified to hearing the foregoing statements made to Dr. Zaring. Dr. Kackley, who took X-ray pictures of Hillman on the morning of November 29th and prior to the operation, testified as follows:

"A. He was very weak and his pulse was very weak and it looked like the man was dying, and he says, 'I don't see much use of you fellows going to any expense any more.' He says, 'I am dying right now and I can't live through this,' and I gave him a little encouragement and washed his lips with some cold water, and he says, 'I don't think I can live through this picture,' and expressed himself several times that he was dying right then.

"Q. Was anything further said with reference to what brought on that condition?

"A. I was looking at his side. I wanted to get, Dr. Zaring requested a flat picture, and he didn't say where he was hurt or anything, but I was looking at his side and asked him how he got that black spot on his side.

"Q. What black spot do you mean?

"A. A contusion or bruise. A. It was a bruise on the skin. It looked like he had been struck or hit in some way, some contusion, I guess is what you would speak of it as.

"Q. What was said with respect to it?

"A. I asked how he was hurt, and he said he went to raise up, and I think he said he struck a wheel. I don't know. I didn't pay much attention to it. He said he struck something as he went to raise up.

"Q. Where?

"A. While he was working, and he spoke of feeling sick at the time, and I asked him why he didn't quit, and he said there was no one else there to take his place is the reason why he didn't quit.

"Q. Was there anything further said to you at that time?

"A. And I asked if he felt sick at the time and he said that he did, and I think he said that he spit up something, but he didn't say that he vomited."

Objection was made to this testimony on grounds both that it was hearsay and that it was not necessary to a diagnosis of the case. This is really the essential and decisive issue in the case before us. The statements made by the injured employee were not made at a time or under circumstances that would permit of their admission as part of the *res gestae*, neither were they admissible as dying declarations.

An examination of the authorities discloses a great contrariety of judicial opinion over the extent to which statements of the injured person made to his physician may be admitted upon the trial of a case involving the occurrence of an accident. The communication here involved was not made to a physician for the purpose of enabling him to testify on the trial of the case and so the present discussion will not have any reference to that class of cases. (65 A. L. R. (1213), note at 1223; also 80 A. L. R., note at 1527.)

On the other hand, this involves directly the admissibility of statements made by the patient to his attending physician in connection with the treatment being administered. It is true that the statement here complained of was made after

the surgical operation had been performed, but it is evident from the record that the physician considered it quite important for him to know, if possible, the cause which had led to the condition which the operation disclosed, in order. to enable him to more intelligently direct his future treatment of the patient. The objection is directed particularly to that part of the statement telling *where and how* the accident happened; that is, that it was the result of the patient's striking himself against a "projector panel" or "regulator panel" *in the building where he had been working.* It is contended that this is the only evidence of the place where any accident occurred, and that this part of the statement made by the patient was not necessary to his treatment by the physician and could in no way assist in the diagnosis of the case. It is urged that if this evidence is eliminated there remains no proof that the injury was received by the deceased in the course of his employment, within the meaning of the Workmen's Compensation Law.

What seems to be the most reasonable rule on this particular question was stated by the Supreme Court of Kentucky in *Valentine v. Weaver,* 191 Ky. 37, 228 S. W. 1036, as follows:

"The testimony of the physicians that Valentine said he stuck a splinter in his finger and the time when this happened was competent, but it was not competent to state where this accident occurred. In other words, it is proper to show the how and the when, but not the where, of the accident, i. e., the manner and time are competent, but not the place."

That was a case where the patient's finger became infected and resulted in his death, and the only evidence produced as to the cause of the infection was the statement of the patient that he stuck a splinter in his finger while engaged in his work. That case has been cited with approval by this court as well as by many other courts. (*Butler v. Anaconda C. M. Co.,* 46 Ida. 326, 268 Pac. 6.) It is true that where a workman suffers a trauma it is probably immaterial, for the purpose of medical and surgical treatment, as to where or at what place the trauma was

received or inflicted; in other words, as the Kentucky court says, "it is proper to show the how and the when, but not the where, of the accident." (*Spiegel's H. F. Co. v. Industrial Commission*, 288 Ill. 422, 123 N. E. 606, 6 A. L. R. 540.)

There are, however, some well-considered cases which hold that the statement by the patient made to his physician as to when, where and how the accident occurred, was admissible if *made under circumstances which indicate the patient had no other purpose or motive at the time than that of enlightening his physician in order to enable him to better administer appropriate treatment;* and that in such cases a degree of judicial discretion must be accorded the judge (board or commission) in the reception and consideration of such testimony.

*Dabbert v. Travellers' Ins. Co.*, 13 Ohio Dec. 792, 4 Life & Acc. Ins. Reps. 366, was a case very similar to the case at bar in the circumstances of the accident. There the only evidence of an accident having occurred was the statement made by the patient to the physician. The same objection was made to the competency and admissibility of the evidence, as was made here. Judge Taft who heard the case held as follows:

"It was held, when this case was before the general term of this court, 'that the physician's opinion was competent evidence, though based in part upon the statements of Mr. Dabbert, as to the cause of his sickness.' It was not deemed expedient to go further in the case as presented in general term. But I am satisfied that there is a tendency in the decisions of the present time to enlarge the range of testimony, especially where it is necessary to avoid a failure of justice. A more complete failure of justice could not be imagined than that of a man holding a policy of insurance against accident, and meeting with an accident when alone, which injured him internally and fatally, and yet causing symptoms such as might be produced by natural disease, if his statements, even to his physician, cannot be taken. It seems to me reasonable to hold that the declarations of the deceased, made to his physician, who prescribes for him, and

on which the opinion of the physician is in part founded, are competent evidence. . . . .

"The statements of the history of his case, made to his physician by a patient, who is seeking relief from pain and severe sickness, are entitled to credit. To state untruly to his doctor the cause of his sickness, would be directly against his most vital interest in saving his health and life. In such a case, the absence of a statement by the patient of such a cause of his sickness would be an important element in forming the physician's opinion. For if a patient did not refer to such an accident as the cause of his sickness, the doctor would necessarily conclude that the symptoms did not come from such a cause. . . . .

"The evidence in the case satisfies me that the deceased did suffer an injury by a fall about the 10th of August, 1867. He said so to his doctor when he sought relief from pain and sickness. It is not possible to conceive that he was, at that time, contriving to defraud the insurance company by dying a natural death under pretense of an accident."

In *Standard Oil Co. of N. J. v. Mealey*, 147 Md. 249, 127 Atl. 850, the Maryland Court of Appeals held that statements of deceased made to his wife and physicians, that he had fallen and struck his side in driving his employer's wagon, were properly admitted. In discussing the rule, the court said:

"The wife testifies that when her husband came home on January 16th, he reported to her that he had slipped and struck his left side on his wagon that day, and had a feeling as if something had torn and she felt a lump or 'bubble' at the place indicated. The superintendent says the man later described to him such a fall against the wagon; and three physicians who attended the man within a few weeks after the beginning of disability, say that when examined he gave each of them a history of such an occurrence. . . . .

"Divergent views have been entertained in other jurisdictions on the relaxation by a court of its ordinary rule for excluding hearsay evidence on review of compensation cases. The commissions which administer the laws in the first in-

stance cannot be expected to adhere closely to the rather complex rules developed for jury trials in judicial proceedings, and they are in many Compensation Laws expressly relieved from doing so.'' (See also *Coghill v. Quincy O. & K. C. Ry. Co.*, (Mo. App.) 206 S. W. 912; 3 Jones on Ev., 2d ed., 2234, par. 1217; 3 Wigmore on Ev., 2d ed., 689, 690, pars. 1720–1722.)

In considering the weight to be given the Maryland case it should be remembered, however, that the compensation laws of that state contain a provision to the effect that ''The commission shall not be bound by the usual common-law or statutory rules of evidence or by any technical or formal rules of procedure,'' etc. A similar provision is found in the compensation laws of New York and many other states, and for that reason holdings of the courts of such states are of only persuasive value where such a statute does not prevail.

Our statute squints in the same direction but does not go to the length of repealing the general rules of evidence. Sec. 43–902, I. C. A., expressly declares that ''the common law system governing the remedy of workmen against employers, for injuries received in industrial and public work, is inconsistent with modern industrial conditions,'' and further proceeding, declares:

''The state of Idaho, therefore, exercising herein its police and sovereign power, declares that all phases of the premises are withdrawn from private controversy, . . . . as is otherwise provided in this act, . . . . and all jurisdiction of the courts of the state over such causes are hereby abolished, except as is in this act provided.''

Sec. 43–1401 provides that:

''Process and procedure under this act shall be as *summary and simple* as reasonably may be and as far as possible in accordance with the rules of equity.''

Sec. 43–1404 provides that:

''The board, or the member of the board to whom the matter has been assigned, shall make such *inquiries and investigations* as shall be deemed necessary.''

It seems clear from the various provisions of the statute that it was the intention of the legislature to provide for a summary and informal investigation of these cases. Nevertheless, we are not prepared to hold that the legislature intended to abrogate the generally prevailing rule excluding hearsay testimony.

We pause to observe here that *Butler v. Anaconda C. M. Co., supra,* simply considered the general subject of admissibility of statements made by an injured person to sundry others but did not consider the specific question here presented of the admissibility of *statements made by the patient to his attending physician for the purpose of obtaining medical or surgical treatment.*

■ If it be conceded that the part of the statement made by Hillman to his physician, to the effect that he hit a projector or regulator panel, was improperly admitted, there is still left in the record sufficient evidence to support a finding that the decedent died from an injury received in the course of his employment, for the following reasons:

(a) The decedent had been in the employ of the company for two or three years, working regularly an eight-hour shift daily, and he had been in excellent health, never had any illness except occasional colds; that he was a man 30 years of age;

(b) That he had worked his full shift on November 27, 1933, and he lived only a few hundred feet from the place where he worked, in a house owned and furnished by the company; and that his whereabouts from the time he returned from his work on the 27th to the time of his death was fully accounted for;

(c) It is clearly shown that he had received a blow of some kind ''on the left side of the body, about the lower margin of the ribs . . . . about directly over the spleen . . . . about the 11th rib posteriorly.'' This was observed by the doctors on examination of the body. The spleen was ruptured; physicians express the opinion that the rupture was the result of a blow;

(d) The evidence of decedent's movements and whereabouts by persons who were with him from the time he left

work on the evening of the 27th to the time of the operation, is so complete and connected in point of time and circumstances as to render it improbable that he could have received the blow disclosed by the contusion at any time after leaving his work on the 27th;

(e) Development of his illness and the presence of old blood clots of from 24 to 48 hours' standing sustain and support the opinion of the surgeon that the trauma had occurred or been received about the time the deceased was working his last shift;

■ (f) Hillman's statement to his doctors as to *when* and *how* he was injured was clearly admissible and established the fact that an *accident* had occurred, *somewhere.*

The foregoing facts and circumstances, well established in the case, are in our opinion sufficient to sustain a finding that deceased died as a result of an accident received in the course of his employment. *It is possible that it was otherwise but not probable.* The law does not concern itself with possibilities. It rather contents itself with a preponderance of probabilities. As quoted by this court in the case of *Beaver v. Morrison-Knudsen Co.,* 55 Ida. 275, 41 Pac. (2d) 605, at 614, 97 A. L. R. 1399: "Here, as elsewhere, the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions." (*Lewis v. Ocean Acc. etc. Corp.,* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129.)

There is another bit of evidence in this case which deserves consideration in the light of our statute. Sec. 38–206, I. C. A., requires an attending physician to file with the registrar of vital statistics a death certificate which shall contain certain information and subd. 17 thereof reads as follows:

"Cause of death, including the primary and contributory causes or complications, if any, and duration of each."

and sec. 38–222 provides for the issuance to anyone requiring it a certified copy of any certificate filed, and among other things says:

"and any such copy of the record of a birth or death, when properly certified by the department to be a true copy

thereof, shall be *prima facie* evidence in all courts and places of the facts therein stated.''

In this case the attending physician filed a death certificate made upon a blank furnished by the department in conformity with sec. 38–206, *supra,* and in answer to the requirements of subd. 17 of that section he answered as follows:

| | |
|---|---|
| If death was due to exter'l causes (violence) fill in also the following: | Date of injury. |
| Accident, suicide, or homicide? | "Accident—11–27–33." |
| Where did injury occur? | "Alexander, Idaho." |
| Specify whether injury occurred in industry, in home or in public place. | "Industry." |
| Manner of injury: | "Blow on left side, accd't." |
| Nature of injury: | "Caused splenic rupture." |
| Was disease or injury in any way related to occupation of deceased? | "Yes." |
| If so, specify: | "Occurred in line of duty." |

It also appears that prior to the death of the decedent and immediately after the surgical operation, the attending physician made and transmitted to the Industrial Accident Board and the State Insurance Fund a report on the case, made upon blanks prepared and furnished for such purposes. In this report and in response to the requirement that he give ''description of the nature and extent of the injury,'' he answered:

''Contused area about 2″/2″ at left lateral border of ribs slightly posterior—ruptured spleen''; and in answer to the question: ''State in patient's own words cause of and how accident occurred,'' said: ''while in stooping position patient quickly arose and struck side against projector panel of switch board.''

■ A certified copy of the death certificate and a like copy of the physician's report of the accident were introduced in evidence without objection, and it is now contended that under the foregoing statute they constituted *prima facie* evidence of each fact stated; and that it was the intention of the legislature in enacting the statute to modify the general rules of evidence to the extent that such certificates should constitute *prima facie* evidence of the facts therein

stated. We are of the opinion that it was the intention of the legislature to so modify the rules of evidence as to render admissible such certificates to the extent and for the purposes enumerated in sec. 38–222, *supra*. Upon the facts found the board should have reached the conclusion of law that the decedent came to his death by reason of an accident which occurred in the course of his employment. The award made by the board did in fact assume such a conclusion of law.

It follows from what has been said that the judgment should be affirmed, and it is so ordered, with costs to respondent.

Givens, C. J., and Budge and Holden, JJ., concur.

Morgan, J., deeming himself disqualified, took no part in the decision.