O'NEIL, Respondent, v. INDUSTRIAL ACCIDENT BOARD, Appellant.

(No. 7,802.)

(Submitted June 1, 1938. Decided July 22, 1938.)

[81 Pac. (2d) 688.]

*Mr. John W. Chapman* and *Mr. E. G. Toomey,* for Appellant, submitted a brief; *Mr. Toomey* argued the cause orally.

*Mr. R. C. Dillavou,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Claimant O'Neil presented his claim to the Industrial Accident Board for compensation for injuries alleged to have been sustained on December 15, 1934, while employed by the Federal Emergency Relief Administration (F. E. R. A.) in Billings, which at the time was operating under Plan 3 of the Workmen's Compensation Act. After hearing before the board his claim was denied. He applied for and was granted a rehearing, after which his claim was again denied. He appealed to the district court. On his application the court granted leave to submit testimony in addition to that in the transcript of the proceedings before the board. The court awarded compensation for total disability, permanent in character, and this appeal followed.

Four points are urged as grounds for reversal. One contention is that claimant did not suffer an industrial accident arising out of and during the course of his employment. It is contended that claimant made such contradictory statements relative to an accident resulting in his disability that his testimony is unworthy of belief.

In his written claim to the board, claimant described the accident as follows: "Setting 12″ x 12″ x 14′ post. Post dropped causing injured to take full weight on left shoulder. Felt pain over left kidney. Later, while erecting 8″ x 8″ x 22′ brace, felt additional pain and tear over left kidney." At the hearing before the board, claimant in explaining how the accident happened testified: "Well, when I went over and helped unload the timbers I helped the truck driver unload them and then we went down and unloaded some gravel down below, I was all right. I came back and took hold of the post and threw it into the hole and I got that jerk when the post went into the hole. I did not notice it very much but soon a pain went just before noon. Just after noon when I put the brace up is when the tearing came and I grabbed my side and went over and sat down on a can, did not think I was hurt like I was. We had

water there—we were fixing the brace on the fence and this fence—the other one was square and it had to be sawed in an angle like that to make it fit on the post square and we had to get it up high enough to measure it and the timber was 22 feet long and I got on my tip toes and reached it with my hands so that this man could get the rail under it."

On rehearing before the board he testified: "In the morning I went over there to the grandstand and Mr. Thurber came out and told me to pick my men and go ahead over there. And I picked Mr. Boggs, and Mr. Boggess and Drewniak, and I went across; and I went over to put the braces in on those corner posts and concrete them in. The timbers came afterwards. Mr. A. L. Bacon brought the timbers about eleven o'clock. And I helped unload the timbers and then I got a jar just after the timbers was unloaded in the morning, off of that big post. * * * Yes, I got a jar there that morning just before noon; but I did not pay any attention to it, much. It hurt, but yet I went ahead and worked." He then explained how he and Drewniak were putting in the brace post, and said: "He [meaning Drewniak] says, 'Just a little higher,' as he went to drive that nail in there. He had a sixty-penny nail to drive under it. And I pushed it up and down came me, post and all, with a hard tear in me right here (indicating) and I grabbed my side, like this."

At the hearing before the district court, the substance of claimant's testimony as to how the accident happened was that he was unloading the post from the truck when he received the first jolt or jar; that he had his shoulder against the post to steady it until "someone could take it down to the hole," and as he was doing so, the opposite end fell to the ground, causing him to be jarred. Mr. Drewniak, Mr. Boggs and Mr. Boggess were present when this happened; it happened in the forenoon. At about 12:50, while assisting Drewniak in putting up the brace, he received the second jar.

These several statements, while not wholly consistent in details, are not so contradictory as to deny all claim to belief. At most the statements varied one from the other with reference

to the exact manner in which the first jolt was received, but there was no difference in the statements as to how the second one was received, and which is the one that finally rendered him unable to continue working.

On the second occurrence he was corroborated by Mr. Drewniak, who was assisting him in putting up the brace post. Boggs, Boggess and Drewniak corroborated claimant on some of the material points relating the first jar.

Appellant, to show the inconsistent statements of claimant as to how the accident occurred, relies upon a statement made by Dr. Farr, his attending physician, who stated that claimant told him the accident happened as follows: ''Three men were carrying 12″ by 12″ timber 14 ft. long—they dropped front end leaving me holding timber, later lifting 6 by 8 brace pole 22 feet long, noticed tearing in side & back.'' Since claimant and three others were working together at the time the accident occurred, it is entirely possible that Dr. Farr might have misunderstood claimant's explanation of the manner in which the accident happened so far as all participants in the work were concerned; in fact, he testified before the court that, ''I don't remember much about what story he did tell me in that connection.''

Appellant contends that claimant's version of the accident is refuted by the records or time slips signed by claimant, which show that he started working on Thursday morning, December 13, and continued working all day Thursday, Friday, Saturday and Monday, December 17. Claimant explained, however, that he signed the time slips in blank before the work was done. He admits that he was paid for the four days, but steadfastly refused to admit that he worked after receiving the second jolt, on Saturday, and in this he was corroborated by many of his neighbors who visited him Saturday afternoon, Sunday and Monday, and found him in bed suffering great pain. Additionally he produced a record from the Emergency Relief Administration assigning him to work, which directed him to report for work at 12:30 on December 13, thus corroborating claimant's statement that he did not work Thursday morning, though

the time slip indicates the contrary. He was also corroborated in this respect by fellow workmen and by others who testified that they knew that on Thursday forenoon he was employed by Frank Swem in doing carpenter work, unconnected with the F. E. R. A.

On the record before the court, which contained evidence not before the board, the court was warranted in finding that claimant suffered an industrial accident arising out of and in the course of his employment. It should be remembered that our province here is to review the action of the court, it having received substantial evidence not before the board. In other words, even though the board, on the evidence before it, might have been fully warranted in denying compensation, yet when, as here, the additional evidence explained away matters on which the board might have been justified in denying compensation, we must sustain the action of the court if it is supported by substantial evidence.

The next point urged by appellant is that the evidence is not sufficient to show total disability of a permanent character. The court made the following findings:

"V. That the injury suffered by the claimant as a result of the accident set forth in the preceding finding, caused a displacement of the left kidney, resulting in continuous pain in the sacrolumbar and left lumbar areas of the claimant's body, which pain has continued from the time of the injury to the present time, and is a constant, dull ache with acute exacerbations of a sharp nature, in such position as stooping, walking down-hill, or going upstairs; that the pain varies in intensity, at times becoming very severe, and is relieved only to a certain extent by the use of sacro-iliac belt; that the claimant has not been able, since his said injury until the present time, and is not now able, to sit up for the reason that this position causes an unbearable exacerbation of the pain in the back, so that when the claimant is resting, he is required to lie down flat on his back with his feet elevated; that he walks at all times with a cane, with a slow, shuffling motion, supporting his back with

his left hand, and that he is unable to stoop or bend over or to straighten himself and walk erect.

"VI. That in addition to the physical condition resulting from said injury, described in the preceding finding of fact, the claimant on occasions suffers from pains which shoot down his left leg, by urinary disturbances, marked by frequency, most noticeable at night, when he is required to get up several times to relieve the bladder discomfort, and which condition, together with the pain suffered by him, interferes with his regular sleep; that subsequent to the accident hereinbefore referred to, and as a result thereof, there is a sharply demarcated area of anesthesia, varying in width, extending down the outer side of the thigh and calf on the left side of the claimant's body, from the crest of the ilium to and over the dorsum of the foot, which area is almost insensitive to touch, pin prick, heat and cold.

"VII. That the physical condition of the claimant described in the preceding findings of fact, has remained more or less constant since the date of the accident; that the claimant is still suffering as a result of said accident, from a psychoneurotic syndrome, and that his disability as a result of said injury is total and permanent in character; that since said injury, claimant has been rejected for other employment because of his physical condition; that claimant's earning power is wholly destroyed and that he is now, and has been since said injury, and will be in the future, incapable of performing remunerative employment of any kind, or to earn a living by manual labor."

The evidence presented at the trial in the district court amply supports these findings. There is no substantial evidence to the contrary. Even the Mayo Clinic, which appellant relies upon, reported to claimant's counsel as follows:

"We found no definite organic cause for Mr. O'Neil's disability. As a matter of fact, I did not so state in my letter because I thought that it might be misinterpreted. I think that this man is suffering from a functional disorder. I am not inferring that he is a malingerer but he is suffering from a functional disability and one for which we can find no organic

cause. Therefore I think if you were to press me into giving any more definite statement, I would be forced to say that I thought he was suffering from a functional disability and post-traumatic psychoneurotic syndrome. On the other hand, however, there is a possibility that he may have a prolapsing intervertebral disc, but it had been my experience in this type of case that usually the cause of disability is due to a post-traumatic neurosis and that operation does not relieve and oftentimes further accentuates the patient's disability.''

Moreover, Doctors Allard and Wernham, two physicians selected by the board to examine claimant and report to the court, reported as follows: ''However, the fact remains that the subject is apparently suffering from some disorder of such a nature that he is *unable to do work of any kind*. The only diagnosis which we can reach from the study of a history and physical findings is that the subject is suffering from a *post-traumatic* psycho-neurosis, a functional rather than organic disorder. The fact that this condition has remained more or less constant during the months that have elapsed since the time of the accident would indicate the possibility of a *fixed* functional syndrome.''

Neurosis resulting from an injury in an industrial accident is compensable. (*Sykes* v. *Republic Coal Co.*, 94 Mont. 239, 22 Pac. (2d) 157; *Best* v. *London Guarantee & Acc. Co.*, 100 Mont. 332, 47 Pac. (2d) 456.)

The court's finding of total disability of a permanent nature was fully warranted by the evidence.

The next contention is that claimant is precluded from recovery by reason of his stipulation to be bound by the Mayo Clinic report. Prior to being examined by the Mayo Clinic, claimant agreed with the board to abide by its report as to the extent of his disability, if any, due to the accident. The clinic was not advised of this agreement in advance of the examination and declined thereafter to become involved in any legal controversy with relation thereto, and because thereof was reluctant to give a report as to the result of its examination. The clinic first reported as follows: '' * * * In this present

instance all we could say would be that Mr. O'Neil tells us that he is incapacitated and cannot work. Now, as this is not corroborated by any positive findings of our own, it immediately loses any legal weight and is really not nearly as valuable to Mr. O'Neil as the opinion of his own physicians there who have had him under observation for a long period and under whose observation he is continuing. I can, therefore, see no good purpose in our interjecting ourselves into legal complications of this affair which has been going on for some two years.'' Upon being pressed for a report, counsel for claimant received a letter containing the statement above quoted. As we read the reports of that institution, they are not sufficiently conclusive to justify the contention that claimant is precluded from receiving compensation by reason of the agreement under which he was sent to the Mayo Clinic.

The last contention of appellant is that the court of its own motion should have resubmitted the case to the board to pass upon it in the light of the additional evidence. The court was not obliged to resubmit the case to the board. Under the statute (sec. 2961, Rev. Codes), the court has authority to modify or change the decision of the board as law and justice shall require, and to make and enter any finding, conclusion, order or judgment that shall be required or shall be legal or proper in the premises. (*Tweedie* v. *Industrial Acc. Board*, 101 Mont. 256, 53 Pac. (2d) 1145.)

Respondent contends that under section 9752, Revised Codes, this court should add to the costs, damages for taking the appeal on the ground that it was taken for the purpose of delay. While we see no merit in the appeal, we cannot say that it was taken solely for the purpose of delay, and hence decline to accede to respondent's request in this respect.

Respondent also requests that this court order deferred payments to be awarded in a lump sum. Such a request does not appear to have been made to the board, and there is no evidence in the record bearing upon the necessity or advisability of a lump sum settlement. The district court properly declined to pass upon this question, since no application therefor was

first presented to the board. (*Landeen* v. *Toole County Ref. Co.*, 85 Mont. 41, 277 Pac. 615; *State ex rel. Mulholland* v. *District Court*, 88 Mont. 400, 293 Pac. 291.)

The judgment appealed from is affirmed.

ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.