(No. 6860.   January 16, 1941.)

FRANCIS J. SKELLY, Appellant, v. SUNSHINE MINING COMPANY, a Corporation, Employer and Surety, Respondent.

[109 Pac. (2d) 622.]

194

Eugene F. McCann and F. C. Keane, for Appellant.

H. J. Hull, for Respondent.

BUDGE, C. J.—March 26, 1938, claimant, Francis J. Skelly, received a personal injury caused by an accident arising out of and in the course of his employment by respondent, Sunshine Mining Company. Appellant was struck on the head by a piece of timber, a cedar lagging, falling 35 feet down an open chute, and was rendered unconscious and him-

self fell 65 feet down a man-way, suffering concussion, laceration of the scalp from ear to ear, broken scapula, and bruises and contusions. May 6, 1939, appellant and respondent entered into a compensation agreement, approved by the Industrial Accident Board May 17, 1939, providing for compensation as follows:

"That according to physician's Reports and Agreement between the parties hereto, said claimant sustained, as a result of said accident, temporary total disability and permanent partial disability as hereinafter set forth; 12/14/38 to 1/25/39 Loss of time from 3/26/38 to 5/3/38; and 3/3/39 to 5/4/39 Being —— weeks and —— days, for which compensation is payable for a period of 19 weeks and 5 days @ $12.00 per week—$240.00 PERMANENT PARTIAL DISABILITY CONSISTING OF: Disability equal to 25% of the loss of the leg at the hip. 25% of 180 weeks equals 45 weeks 99% of 45 weeks @ $12.00 equals $534.50."

April 9, 1940, appellant filed a petition for modification of the compensation agreement alleging a change in conditions as follows:

"That after the date of the above-mentioned agreement the physical condition of your petitioner changed and your petitioner suffered more and more severe headaches and the condition of the right arm of your petitioner became worse in that it became so painful that he was unable to lift or work with said right arm and shoulder, and the physical condition of your petitioner is now such that he has a permanent total disability because of the above mentioned injuries to his head and shoulder."

After a hearing the board found there had been no change in conditions resulting from the accident and injury to claimant since the 6th day of May, 1939, the time the compensation agreement was entered into, and ordered that appellant's petition for modification be denied and dismissed, from which order this appeal is prosecuted.

Assignments of error 1 and 2 urge that the board erred in making its finding that appellant "has suffered intermittently with severe headaches, and to about the same extent he so suffered at the time he entered into the above mentioned agreement", for the reason the evidence is conclusive that

the headaches had become much more frequent and much more severe, and there is no evidence in the record supporting the finding of the board; and in making its ruling of law that appellant was not entitled to a modification based upon such alleged erroneous finding.

It is well settled that a compensation agreement between claimant, employer and surety, approved by the Industrial Accident Board, has the same effect as an award of the board, subject to review on appeal, in the absence of fraud is final and conclusive as between the parties, except, that on application therefor, "on the ground of a change in conditions" the board may make an award "ending, diminishing or increasing the compensation previously agreed upon or awarded." (*Zapantis v. Central Idaho Min. & Mill. Co.,* 61 Ida. 660, 106 Pac. (2d) 113, and cases therein cited.) The burden of proof is on the party moving for a change or modification of the compensation award. (*Boshers v. Payne,* 58 Ida. 109, 70 Pac. (2d) 391.)

In support of his petition appellant testified that about two months after the agreement his condition changed; that the change manifested itself in increased headaches and dizziness. That his headaches were frequent at night, lasting all night if he could not get them stopped and go to sleep and that he got no sleep at all from three to four and sometimes five nights a week. In this he was corroborated by his wife who testified he complained of headaches several times a week at night, that he would wake her up during the night and complain of headaches and she would put cold cloths on his head and give him aspirin and that the headaches became more frequent and his condition more pronounced as time went on. Appellant further testified he believed his shoulder was getting worse, that driving a truck, shoveling or running a wheelbarrow, any lifting at all made his shoulder hurt worse. The board's finding number eight is as follows:

"That claimant's condition has remained about the same since November of 1939, and that there has been no change in conditions resulting from the accident and injury to claimant since the 6th day of May, 1939, the time he entered into the said compensation agreement as above stated."

It may be said that it appears from the record that there has been no perceptible change in appellant's purely physical condition. At least there is evidence by the medical witnesses that such appeared from their physical examination of appellant. However, the fact that appellant did have the headaches described by him, that they were more frequent, and that his condition as a result was becoming more and more pronounced, is not contradicted but on the other hand is conceded by the medical witnesses. Appellant contends that even though his present condition is the result of traumatic neurosis it is compensable, relying upon *Jenkins v. Boise Payette Lumber Co.,* 49 Ida. 24, 287 Pac. 202, in which case with reference to a similar mental condition this court announced the following:

"The only positive evidence in the record, therefore, with regard to claimant's mental condition was that he was suffering from traumatic psychosis, which had progressed since the previous hearing; in other words, that he was in a worse mental condition. Respondents-appellants, concede for the purpose of this action that mental psychosis, if the result of a personal injury by accident, as here, is compensable. *The evidence, therefore, does not support the finding or conclusion of the board that there was no changed condition, since Dr. Pittinger testified, and was not contradicted, that claimant's inability came from his mental and not his physical condition.* The district court, therefore, should have remanded the matter to the board for the purpose of having it make the proper finding as to the extent of the disability and award." (Emphasis inserted.)

In *Morris v. Garden City Co.,* 144 Kan. 790, 61 Pac. (2d) 920, the court said:

"Here the injury from the same accident was to the foot and to the head. The injury to the foot was severe. The head contusion was spoken of as being slight, but the combined effect was to shatter his nerves, to the extent that it affected his mentality. He is a neurotic, totally incapacitated for work. Under the evidence and the findings of the trial court there is no room to say compensation should be limited to that for a scheduled foot injury.

"Traumatic neurosis long has been recognized as being compensable under workmen's compensation laws, not only in England (*Eaves v. Blaenclydach Colliery Co., Limited* (1909), 2 K. B. 73; *Yates v. South Kirby, etc., Collieries, Ltd.* (1910), 3 B. W. C.. C. 418, 3 N. C. C. A. 225; *Wall v. Steel,* (1915), 84 L. J. K. B. N. S. 1599, 10 N. C. C. A. 1041), from whence we took our compensation act (*McCormick et. al. v. Coal & Coke Co.,* 117 Kan..686, 690, 232 P. 1071), but in this country under statutes quite like our own. (*Harris v. Castile Mining Co.,* 222 Mich. 709, 193 N. W. 855; *Hunnewell's Case,* 220 Mass. 351, 107 N. E. 934; *Rialto Lead & Zinc Co. v. State Industrial Comm.,* 112 Okl. 101, 240 P. 96; 44 A. L. R. 494; *Sigley v. Marathon Razor Blade Co., Inc.,* 111 N. J. Law, 25, 166 A. 518; *Patsaros v. John Eichler Brewing Co.,* 245 App. Div. 873, 282 N. Y. S. 183. See, also, cases collected in the annotation 86 A. L. R. 961–966.)"

In *O'Neil v. Industrial Accident Board,* 107 Mont. 176, 81 Pac. (2d) 688, statements of examining physicians were quoted as follows:

"We found no definite organic cause for Mr. O'Neil's disability.

" . . . .

"The only diagnosis which we can reach from the study of a history and physical findings is that the subject is suffering from a *post traumatic* psycho-neurosis, a functional rather than organic disorder."

and the court stated total disability of a permanent nature was fully warranted by the evidence, and affirmed the judgment appealed from, stating:

"Neurosis resulting from an injury in an industrial accident is compensable, *Sykes v. Republic Coal Co.,* 94 Mont. 239, 22 P. (2d) 157; *Best v. London Guaranty & Accident Co.,* 100 Mont. 332, 47 P. (2d) 456."

In view of the holding of this and other courts, referred to above, it appears that the mental disorder termed traumatic neurosis although arising from a mental rather than a physical condition, if the result of a personal injury by accident arising out of and in the course of appellant's employment, is compensable, and if occurring after the agreement for or award of compensation it amounts to a change

in condition. As was said in *Hustead v. H. E. Brown Timber Co.*, 52 Ida. 590, 17 Pac. (2d) 927, quoting from *Henry Cowell L. & C. Co. v. State Industrial Acc. Com.*, 211 Cal. 154, 294 Pac. 703, 705, 72 A. L. R. 1118:

" 'Many times the seriousness of the injury is not at first apparent, and from its very nature cannot be detected until considerable time has elapsed after its infliction. The clear intent of the statute in such cases is that the injured employee shall be entitled to compensation for his permanent disability notwithstanding the fact that he may in the early stages of his injury have been granted an award only for temporary disability, or may have been paid compensation voluntarily by his employer;' "

The evidence with relation to appellant's condition during the period of time following the compensation agreement and when examined physically by members of the medical profession shortly preceding the hearing on appellant's petition for modification is found entirely in the testimony of appellant and his wife, heretofore referred to, and Doctors Smith and Lynch, the two latter being witnesses for respondent. As heretofore stated appellant and his wife testified that his headaches had become more frequent and more severe and that he suffered many sleepless nights as a result thereof and that his ability to work was directly and materially affected. Dr. Smith's testimony was to the effect that appellant's physical condition appeared unchanged, but that he was suffering from neurosis resulting from the injury received March 26, 1938, with reference to which compensation was awarded. With reference to appellant's shoulder Dr. Smith testified that appellant complained of an ache in the right shoulder particularly when the arm was raised above a right angle, and that rotating the arm disclosed a slight limitation of motion; that particularly when the arm is extended to a right angle and externally rotated appellant complains of pain and also in raising it beyond a right angle and that appellant has a tenderness about one inch above the tip of the conoid process on the top of the shoulder. The testimony of Dr. Smith also discloses the following:

"Basing your opinion on the entire history of this case as you have known it, together with the history given by Mr.

Skelly and the testimony you have heard here today. I will ask you to state—give your opinion as to whether or not Mr. Skelly's condition of which he complains has any relation to the injury that he suffered on March 26, 1938?

"A. Yes, I think it has.

"Q. Will you state what relation? Give your opinion.

"A. As to his present trouble?

"Q. Yes.

"A. I think Mr. Skelly has a neurosis without basis of physical lesion. There is nothing we can pin this to, nothing we can find in the examination that should cause these symptoms. I think he has a traumatic neurosis which is aggravated from the history by certain things which have occurred. Largely important in that line would be alchoholism and any mental distress, worry over marital conditions or financial conditions. Any of these things would tend to aggravate it and multiply the symptoms.

"Q. You mean by traumatic neurosis that the condition is one which—not based upon anything physical. Is that the answer?

"A. Yes. I think that is correct. You can have a traumatic neurosis from a blow on the chest, for instance, or.

"    . . . .

"Q. Doctor, what is his physical condition, or was it at the time of your last examination compared with that physical condition at the time you made your first examination of the patient?

"A. I would say his physical condition is very similar.

"    . . . .

"Q. What do you mean by the term neurosis, traumatic neurosis? . . . .

"A. That is a condition in which we see certain patients following accidents in which they have multiple nervous symptoms, symptoms manifest in certain ways more than others. Frequently they are in a condition of extreme nervousness, frequently a headache, often certain pains, vasomotor symptoms, they are unstable to some extent mentally. It is a matter of becoming adjusted to their physical condition. They are out of adjustment.

"    . . . .

"Q. And all the tests you gave him disclosed no injury?

"A. Disclosed no evidence of pressure.

"Q. Might he have a headache without pressure there?

"A. Certainly.

"Q. Caused from those injuries?

"A. Started from that. Yes.

" . . . .

"Q. Without this injury that he sustained, Skelly would not be suffering from this neurosis, would he, in your opinion?

"A. Without any injury I would say probably not.

"Q. There is no way, you state, that you can definitely determine whether or not these headaches he has described are attributable to that injury?

"A. Well, they are attributable to it in the sense of following after. In the sense of having any growth following the injury, of any intercranial trouble following the injury, they are not.

" . . . .

"Q. What changes, if any, have you found in Mr. Skelly between May 17, 1939, the date he got his permanent partial disability and this time?

"A. *There is a change in his complaints* but not in his physical findings.

" . . . .

"Q. There is no way you can determine whether or not a person is suffering from a headache by an examination of their physical being is there?

"A. No. It is perfectly true you have to take their word." (Emphasis inserted.)

From the examination of Dr. Lynch appears the following:

"Q. You mentioned he complained of shooting pains throughout his head. Would that follow any nerve channel, or did it?

"A. No. They do not.

"Q. What significance is that?

"A. It indicates a neurosis. . . . .

"Q. From your examination and study of this case and what you have heard, what is your diagnosis, if you are able to make one of Mr. Skelly?

"A. This boy undoubtedly had a concussion of the brain and suffered a very definite head injury, a hard blow which rendered him unconscious an indefinite period of time, at least several hours. People having had a concussion of the brain do complain of headaches and dizziness afterwards. Under ordinary circumstances, after this length of time it is my opinion this boy should have recovered from his headaches and dizziness, if other facts were not brought to bear on him to keep him worried. I attach considerable significance to his statement of not being able to work underground because when he would attempt to work underground he would immediately have a sense of fear, although it might be a subconscious thing. He had a fear of going underground again. He says his headaches would become worse. Every time he tried to work underground that occurred and so his headache on those occasions would be the result of nervous stimulation more than any injury to his brain.

"Q. Would other sources of worry have a similar effect?

"A. Yes. His marital difficulties would be a factor and I think he is worried about himself and he is afraid his headache—head injury will influence his future, that he won't be able to do heavy work again and he has domestic trouble and probably financial worries also. *I think this boy had a concussion of the brain super-imposed on top of which are a number of circumstances tending to aggravate and prolong the issue.*" (Emphasis inserted.)

"Q. Assuming that since that time in place of improving, the claimant has shown a marked depreciation as far as ability to do work is concerned. Would your answer, taking that into consideration be the same? . . . .

"A. I would answer your question this way: That if I were able to go over this boy neurogically and find evidence of *definite brain injury* from which I thought he had never recovered and would not be recovered, 25% would not be enough but *it is my opinion he has no organic injury and his present complaints are not entirely the result of the blow to his head but are contributed to by circumstances taking place since the time of the accident.* . . . .

"Q. But the headaches would not be present if it were not for the accident down at the Sunshine, would they?

"A. That is half truth, but. . . . . Because if he had not had these other emotional factors he would not have the present headaches. . . . .

"A. I will have to go back again. He has several definite neurogical complaints, entirely subjective, that are diagnostic of a neurosis. Those complaints are headache, dizziness, a finger point type of pain, an increased tolerance to alcohol, excitability, insomnia, all symptoms of neurosis. *This boy has them.*

"Q. This boy also has headaches on an average of four times a week which keep him awake on an average of twice a week the entire night.

"A. That is right. . . . .

"Q. You have no reason to doubt the truthfulness of that statement?

"A. I do believe him. I think he has the headaches. . . . . The only objective finding this boy has is a cardinal symptom of neurosis and that is the type of anesthesia he presents. From that finding it strengthens my opinion this boy's headaches are on a neurotic basis at this time. If this boy had an injury to his brain sufficient to produce as much headache as he has, he would have to have some objective symptoms and that I could not find, but I do find evidences of neurosis.

"Q. But the neurosis is chargeable to the injury he sustained down there, is it not?

"A. Remotely so, *the injury incited it.* . . . .

"Q. Did I understand you to say that if you believed the claimant actually was suffering from his complaints and it was due to the injury you would place greater rating on your disability?

"A. Yes. Because he would have permanent damage from which he would not recover.

"Q. Assuming that he has that disability then, now can you give me your opinion as to his disability. Assuming the complaints he makes to you are real and actually there, and also taking into consideration the neurosis which he now has is the result of the injury. For the purpose of your answer assume that and give me an estimate of his permanent partial disability?

"A. I would say 25% of his working power at the present time has been lost as a result of the accident." (Emphasis inserted.)

██  From the foregoing testimony it appears that both medical witnesses for respondent were of the opinion that appellant was suffering from the headaches, dizziness, insomnia and other complaints he related to them and about which he testified. They were further of the firm conviction that his condition was not from a brain injury or an organic injury but was neurotic in character or was traumatic neurosis definitely traceable in part to his accident and injury. To say that if appellant had had no marital, financial or other worries and had entirely refrained from the use of alcohol, tobacco and work underground, his neurotic condition might not have existed, and therefore since these aggravating causes were not attributable to the respondent employer recovery should be barred, is like saying that appellant should not recover for the loss of a leg because the cut he received would not have resulted in such loss had gangrene not set in. It has been determined that intervening and aggravating causes by which disability is increased are no bar to recovery, claimant not being at fault. (*Oleszek v. Ford Motor Co.*, 217 Mich. 318, 186 N. W. 719; *Smith v. Essex County Park Com.*, 15 N. J. Misc. 227, 190 Atl. 45.) In *Smith* v. *Essex County Park Com., supra,* it was held that a claimant was entitled to compensation for increased disability consisting of traumatic neurosis resulting from an accidental injury, notwithstanding that the neurosis was accentuated by economic distress, financial worries, family troubles, and difficulties with relief authorities.

██  There is no evidence to support the board's finding that there has been no change in conditions resulting from the accident and injury to claimant since the 6th day of May, 1939, or the conclusion that the claimant is not entitled to a modification of the compensation agreement, or the order denying and dismissing the application.

██  Finally it is urged by appellant that Drs. Bonebrake and Smith were permitted to testify to appellant's physical condition in violation of the provisions of sec. 16–203, I. C. A., subparagraph 4, providing that "a physician or

surgeon can not, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient." Section 43–902, I. C. A., declares that all phases of the premises (Workmen's Compensation) "are withdrawn from private controversy, and sure and certain relief for injured workmen and their families and dependents is hereby provided regardless of fault and to the exclusion of every other remedy, *and to that end all civil actions and civil causes of action* for such personal injuries, and all jurisdiction of the courts of the state over such causes are hereby abolished, except as in this act provided." (Emphasis inserted.) In proceedings before the Industrial Accident Board physical condition of the workman is ordinarily one of the most pertinent elements. The burden is upon the employer to provide reasonable medical and surgical attendance (sec. 43–1108, I. C. A.), hospital contracts are authorized by mutual agreement between employer and employee (sec. 43–1108, I. C. A.). Special physical examination upon request of the employer is provided for (sec. 43–1201, I. C. A.) and the board may require a physical examination. (Sec. 43–1405, I. C. A.) The record herein discloses that Drs. Smith and Bonebrake were contract doctors employed jointly by the Sunshine Mining Company and its employees under the provisions of sec. 43–1108, I. C. A. At least with relation to doctors jointly employed as were Drs. Smith and Bonebrake, the privilege rule has no application in a proceeding before the Industrial Accident Board.

The order of the Industrial Accident Board should be reversed and remanded to the board for the purpose of making and entering findings and conclusions in conformity with the views herein expressed and for the purpose of determining the extent of the disability and amount of award, and it is so ordered.

Givens, Morgan and Holden, JJ., concur.

AILSHIE, J., Dissenting.—The amendment to the Constitution (sec. 9, art. 5), ratified November 3, 1936, admonishes us that *"On appeal from orders of the Industrial*

*Accident Board the court shall be limited to a review of questions of law."* (1937 Sess. Laws, p. 499.) This court has, I think, heretofore observed the foregoing admonition as nearly as it is possible to do so. (*Knight v. Younkin,* 61 Ida. 612, 105 Pac. (2d) 456, 459; *Totten v. Long Lake Lumber Co.,* 61 Ida. 74, 97 Pac. (2d) 596, 598; *Potter v. Realty Trust Co.,* 60 Ida. 281, 90 Pac. (2d) 699, 703.)

In the present case it seems to me, however, that the majority of the court is overstepping the limits set by the Constitution in this respect. In confirmation of my belief, I refer to the evidence quoted in the majority opinion which, in itself, seems to me, contains sufficient facts to support the findings and conclusion of the Industrial Accident Board, to the effect

"That claimant's condition has remained about the same since November of 1939, and that there has been no change in conditions resulting from the accident and injury to claimant since the 6th day of May, 1939".

I call special attention to the following excerpts from the testimony of Dr. Smith:

"He has no neurological signs indicative of any lesion in the brain.

. . . . . . . . . . .

"I cannot find anything. There is nothing in our tests that coincides with the complaints. . . . .

On cross-examination:

"I don't think there is any substantial physical difference for I can't find any.

. . . . . . . . . . .

"Q. One found suffering from traumatic neurosis is not a conscious malingerer, is he?

"A. Not entirely.

"Q. He is not conscious of the fact he is malingering, is he?

"A. Perhaps you would not call it malingering. I would say it is partially imaginary."

On redirect examination:

"Q. What changes, if any, have you found in Mr. Skelly between May 17, 1939, the date he got his permanent partial disability, and this time?

"A. *There is a change in his complaints but not in his physical findings.*" (Italics supplied.)

In addition to the testimony quoted in the majority opinion and the foregoing, there was much other medical and expert testimony, among which was the testimony of Dr. Lynch, an experienced surgeon of Spokane, who has had special training in brain surgery and neurology. Dr. Lynch made a very thorough personal examination of the claimant and took his complete history which is recited in the doctor's testimony. He reaches the conclusion and expresses the opinion, that no substantial change has taken place in the condition of the claimant since the former award and, among other things, he says:

"Q. Were you able to find any objective symptoms which would account for the complaints Mr. Skelly makes?

"A. I could find no objective symptoms or anything that would lead me to believe there was a lesion of any portion of his brain.

"Q. What is the significance of his pointing out a localized pain to you in connection with the type of symptoms?

"A. That is a very common neurotic complaint. An individual who has headache from an injury to the covering of his brain or to his brain will almost never localize their pain to an area delineated by a finger point. Their pain is over the entire head. They have an apparently deep headache confined to one area. In neurology we look for the finger point pain because it means a functional disturbance as compared with an organic disturbance.

"Q. You mentioned he complained of shooting pains throughout his head. Would that follow any nerve channel, or did it?

"A. No. They do not.

"Q. What significance is that?

"A. It indicates a neurosis.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. Is there anything in connection with his physical person you could observe which would be responsible for those headaches other than the injury sustained at the Sunshine?

"A. Yes.

"Q. What, in connection with his physical person—physical examination would be responsible?

"A. The signs of neurosis this boy possesses. The transitory anesthesia, the finger point pain, the mans increased tolerance of alcohol and his insomnia, and all those signs of neurosis. The only objective findings this boy has is a cardinal symptom of neurosis and that is the type of anesthesia he presents. From that finding it strengthens my opinion this boy's *headaches are on a neurotic basis at this time. If this boy had an injury to his brain sufficient to produce as much headache as he has, he would have to have some objective symptoms and that I could not find, but I do find evidences of neurosis.* (Italics supplied.)

"Q. But the neurosis is chargeable to the injury he sustained down there, is it not?

"A. Remotely so. The injury incited it.

"Q. What do you mean by remotely so?

"A. I have patients in my office who will come in complaining of symptoms like this boy who have never had a head injury. They have a neurosis as a result of some conflict not relating to an injury and for that reason I can visualize this boy with the same complaints as he is having domestic and financial worries, even without a head injury."

The only allegation of change in condition is that found in paragraph VI of the "Petition for Modification," which is as follows:

## "VI.

"That after the date of the above-mentioned agreement the physical condition of your petitioner changed and your petitioner suffered more and more severe headaches and the condition of the right arm of your petitioner became worse in that it became so painful that he was unable to lift or work with said right arm and shoulder, and the physical condition of your petitioner is now such that he has a permanent total disability because of the above-mentioned injuries to his head and shoulder."

The Board found "That claimant's condition has remained about the same," and I think there is evidence to sustain their finding. The people, by amending the Constitution, took from the court the authority to weigh evidence in compensa-

tion cases and vested the authority to do so in the Industrial Accident Board. Now, with unmistakable proof that "no change has occurred" in the *physical condition* of claimant, this court, nevertheless, is reversing the order of the Board because it is thought, perchance, the "condition . . . . was *neurotic* in character or was traumatic *neurosis,* definitely traceable in part to his *accident and injury."* (Italics supplied.) If the neurosis is the result of the original accident (trauma), then the injury must have been received at that time and was "accident neurosis"; but at least one of the expert witnesses attributes the neurosis to *anxiety, worry, domestic trouble, use of alcohol,* etc. Were these not proper questions of fact addressed to the judgment of the board? Was the trauma not known at the time of the original award? Was the cause of the *neurosis* not known at that time?

The majority opinion in this case accomplishes in an indirect way what we disapproved in *Zapantis v. Central Idaho Min. & Mill. Co.,* 61 Ida. 660, 106 Pac. (2d) 113, in that it, in effect, changes and revises an order and judgment of the Board after it has become final, and accomplishes that judicial feat, under the assumption that the evidence shows, without conflict, that a "change of condition" had taken place,— whereas in the Zapantis case we held that "after a judgment [of the Board] has been entered and has become final," the case cannot be reopened and revised and passed upon anew.

The objection to the introduction of the testimony of the doctors is predicated on subd. 4 of sec. 16–203, I. C. A., reading as follows:

" . . . . 4. A physician or surgeon can not, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

If this were an ordinary action at law for damages, objection here made would be well taken, but it is not thought that a proceeding like this, under the Workmen's Compensation Law, is an *action* within the meaning of the foregoing statute. It is clearly not an action at law; it is rather a *special proceeding.*

Section 43–902 repeals the common law system governing such actions at law and abolishes the right to prosecute a

civil action in such cases, substituting therefor the Workmen's Compensation Law. (Title 43, chap. 9, I. C. A.)

Section 43–1107 provides that the employer shall furnish ''an injured employee such reasonable medical, surgical or other attendance . . . . as may be required or be requested by the employee immediately after an injury, and for a reasonable time thereafter. If the employer fails to provide the same, the injured employee may do so at the expense of the employer.''

Section 43–1108 provides for hospital contracts or agreements and authorizes the assessment of the employee for the benefits of such contract.

Section 43–1201 provides that:

''After an injury and during the period of disability the workman, if so requested by his employer, or ordered by the board, shall submit himself to examination, at reasonable times and places, to a duly qualified physician or surgeon designated and paid by the employer. . . . . If a workman refuses to submit himself to or in any way obstructs such examination, his right to take or prosecute any proceeding under this act shall be suspended until such refusal or obstruction ceases, and no compensation shall be payable for the period during which such refusal or obstruction continues.''

Section 43–1405 provides that the Industrial Accident *Board or any member thereof may appoint a duly qualified physician to examine the injured employee and report.*

From the foregoing sections, it seems clear that the legislature did not intend or contemplate that the testimony of a physician, attending an injured employee, should be privileged from testifying in a case where the employee is seeking compensation under the compensation law. On the contrary, it is very clear that it was anticipated that the testimony of attending physicians would be material and essential in establishing the character, nature, and extent of the injury and, to a large degree, in determining the amount of compensation the injured workman will be entitled to receive.

It would be very difficult to fairly and equitably administer the compensation law or, with any reasonable degree of accuracy, determine the actual facts involved in a compensation

claim, if the claimant may, when he thinks it advantageous to him, claim the privilege accorded by sec. 16–203, as applied in ordinary actions at law.

There is authority from the courts of other states, having similar statutes, supporting the views above expressed. In the case of *McFeely v. Industrial Acc. Com.*, 65 Cal. App. 45, 223 Pac. 413, 415, in discussing an objection to the admission of evidence of physicians and specialists, the court said:

"We think, however, that there cannot be any question of the competency of this testimony in the light of the statutory law and decisions of this state. Workmen's Compensation Insurance and Safety Act of 1917, sec. 19, subd. (c)."

In *Winthrop v. Industrial Acc. Com.*, 19 Pac. (2d) 841, the District Court of Appeals of California had occasion to comment on the evidence given by the surgeon who attended the case, and held that his testimony *was not privileged under the general statute*. Paragraph 1 of the syllabus reads as follows:

"Law of privileged communications *held* inapplicable to surgeon performing operation on compensation claimant to remove disability."

In that case the court annulled the award made by the commission and remanded the case for further proceedings. The commission subsequently heard the case and entered an award and thereafter the matter was again taken to the court of appeals for review. (*Winthrop v. Industrial Acc. Com.*, (Cal. App.) 22 Pac. (2d) 579.) In the latter case the court adopted and approved the former opinion of the same court, and paragraph one of the syllabus to that opinion is the same as above quoted.

In *Korobchuk's Case*, 277 Mass. 534, 179 N. E. 175, 176, the Massachusetts court said: "Under G. L. c. 152, sec. 9, the report of a duly qualified impartial physician appointed by the Industrial Accident Board may be received in evidence." See, also, the following cases: *Phillips' Case*, 278 Mass. 194, 179 N. E. 691, 692; *Union Lumber Co. v. Industrial Acc. Com.*, 124 Cal. App. 584, 12 Pac. (2d) 1047, 1048.

The Supreme Court of Michigan, in the case of *La Count v. Von Platen-Fox Co.*, 243 Mich. 250, 220 N. W. 697, 699, has said:

"The privilege of the patient is not of common law, but rests upon the statute, and the waiver thereof is in the same statute, to prevent the suppression of evidence by one seeking aid of the law in securing compensation for a personal injury."

No case has been called to our attention from this court, in which the question has been considered or passed on, although in most of the industrial accident cases the testimony of the attending physician or surgeon has been uniformly received without controversy. (*Hillman v. Utah Power & Light Co.,* 56 Ida. 67, 74, 51 Pac. (2d) 703.)

I agree, therefore, that sec. 16–203, subd. 4, *supra,* does not apply to the testimony of physicians, in so far as it relates to injuries received in accidents under the Workmen's Compensation Law.

The order appealed from should be affirmed.