(No. 6429.  July 17, 1937.)

MARK BOSHERS, Employee, Respondent, v. C. M. PAYNE and W. J. DOUST, Doing Business as PAYNE & DOUST, and AETNA CASUALTY & SURETY COMPANY, Surety, Appellants.

[70 Pac. (2d) 391.]

Weldon Schimke, for Appellants.

O. C. Wilson, for Respondent.

AILSHIE, J.—Appellants, Payne & Doust, were general contractors engaged in doing construction work in Boundary county in this state. Respondent (a single man, 41 years of age) had been working for appellants as a powder man in their rock quarry. September 2, 1924, while standing on the bank of the quarry, respondent was struck on the head with "a flying missile presumably thrown from a cable used to handle a heavy Bagley scraper, rendered unconscious and knocked into the rock pit." The rock scraper was dragged over and across his body; he was taken up with a load of rocks and dragged over to a rock crusher. As a result of the accident he suffered disabilities to his right leg as follows: Crepitus in the knee joint (equivalent to 75 per cent loss above knee); stretching of the internal lateral ligaments and all ligaments of knee joint relaxed; flail-like motion of leg when walking. His left leg was disabled as follows: Improper alignment of tibia; badly displaced union of fibula; limitation of motion of ankle, interference of blood circula-

tion in leg, ankle and foot; weakness and stiffness of leg muscles, equivalent to 75 per cent loss between knee and ankle. The disability in his legs precluded him from carrying burdens of even moderate weight. His right external ear was cut off and one-third of hearing lost.

Respondent received medical and surgical attendance and treatment in a hospital until February 26, 1925, and further medical attention in Spokane until September 1, 1925. Ten medical examinations were given him from September 2, 1924, to August 18, 1926. August 16, 1927, the Industrial Accident Board approved an agreement entered into between the workman and the contractors, whereby it was agreed between the parties, and approved and ordered by the board, that Bosher should receive compensation for the full period of 400 weeks, at $12 per week, and thereafter $6 per week during the remainder of his life. This order became final.

February 3, 1936, the Industrial Accident Board received a petition from appellants for a new award, on the ground that there had been a change and improvement in condition from that of permanent and total disability as originally determined. In accordance with stipulation of the parties, depositions were taken of Drs. Delehanty and Barnard (practicing physicians of Colorado, who examined respondent in 1934 and 1935), of a Mrs. Williams (landlady of a Denver hotel where respondent roomed) and of respondent himself. The petition was heard on depositions, and on May 9, 1936, the board entered its order dismissing the petition for modification of award, from which order appeal was taken to the district court. The matter was heard in the district court on stipulation and briefs of counsel, and judgment was there entered sustaining the decision of the board and dismissing the appeal, from which judgment this appeal has been taken.

The assignments of error are all to the effect that the board and the trial court erred in not finding and holding that respondent's condition has materially improved and that the award should be modified and payment discontinued.

Sec. 43–1407, I. C. A., as it read *before amendment* in 1931 (C. S., sec. 6269) provides as follows:

"On the application of any party on the ground of a change in conditions, the board may at any time, but not oftener than once in six months, review any agreement or award, and on such review may make an award ending, diminishing or increasing the compensation previously agreed upon or awarded, subject to the maximum and minimum provided in this chapter, and shall state its conclusions of fact and rulings of law, and immediately send to the parties a copy of the award, but this section shall not apply to a commutation of payments under section 6240."

It is contended by appellant, and conceded by respondent, that, under the authority of *Kelley v. Prouty*, 54 Ida. 225, 30 Pac. (2d) 769, the above-quoted statute applies to this case and that the application for a modification of the previous award might be made at any time. It will be noted that the authority of the board to *end, diminish, or increase* an award rests on the "ground of a change in conditions." The statute does not undertake to define or prescribe the nature, character, extent or duration of the "change in conditions" necessary to either justify or require a modification or change of the award.

In *Rodius v. Coeur d'Alene Mill Co.*, 46 Ida. 692, 695, 271 Pac. 1, this court held that it is necessary to both plead and prove "change in condition" in order to obtain a modification of a final award. Other courts have considered the questions as the burden of proof, weight of evidence and the time and character of changes that enter into decisions in this class of hearings. In *Davon Oil Co. v. State Ind. Commission*, 177 Okl. 612, 61 Pac. (2d) 579, 581, the Oklahoma court said:

"On the application to discontinue payment of compensation, the burden was upon the petitioner to establish by competent evidence a state of facts which would justify such action by the commission . . . . The competent medical evidence before the commission with reference to whether the temporary total disability of the respondent had terminated was in conflict. The commission chose to give greater credence to the testimony of the witnesses appearing for the respondent. This they were privileged to do . . . .

"The commission by its order found that the petitioner had failed to sustain the burden resting upon it. We think that the commission was correct in so holding, and that the order made finds ample support in the competent evidence adduced before the commission. This being true, it is our duty to sustain such order."

In *Johnson v. Pearson*, 264 Mich. 319, 249 N. W. 865, the Supreme Court of Michigan considered the question as to the burden of proof and nature of evidence submitted on an application to discontinue compensation and said:

"The case presents difficulties, as the testimony is conflicting and rather barren of any but subjective proofs of the continuation of appellee's incapacity. On a petition to stop compensation, however, the burden of proof is upon the petitioner." (Citing authorities.)

The compensation act of Georgia apparently contained substantially the same provision as sec. 43–1407, I. C. A., with regard to modification of awards and in considering this question, in the case of *Fralish v. Royalty Indemnity Co.*, 83 Ga. App. 557, 186 S. E. 567, 571, the court said:

"It is only where the future developing facts and circumstances show a change in condition with reference to the claimant by reason of his previous injury, such as would show an increase or decrease in the extent of his disability and consequently change the amount of his weekly compensation payments, that a former award, finding the claimant a certain per cent. disabled and therefore entitled to receive compensation payments in accordance therewith, may be changed by the department upon application for a review thereof. *American etc. Ins. Co. v. Hampton*, 33 Ga. App. 476, 127 S. E. 155. Where there is no change in condition, the department cannot rehear the case on its merits and determine under the evidence that the claimant was totally disabled and had been since his injury, and make an award increasing his weekly compensation payments from a 50 per cent. disability basis to a 100 per cent. disability basis, or *vice versa*. *Gravitt v. Georgia Casualty Co.*, 158 Ga. 613, 614, 123 S. E. 897. It has been held in other jurisdictions that in such a case evidence that the claimant's physical condition has always been worse

than found by the former award is not a showing of a change in condition. See 71 C. J. 1438, and citations."

That such an application may not be employed to serve as an appeal or as grounds for reversal of an award which has become final, was held in the case of *Standard A. I. Co. v. Hinson*, 251 Ky. 287, 64 S. W. (2d) 574, wherein the Kentucky court of appeals said:

"There are two obstructions in the way of securing a reversal of the judgment on account of the incompetent evidence about which complaint is made: First, an award is in the nature of a judgment, and the right acquired under it cannot be destroyed by a mere refusal to recognize it and thereby compelling the injured employee to have the case reopened and prove his right to the compensation; or, indeed, by doing the same thing by simply petitioning for a review. The burden is upon the one claiming a change in conditions upon which the award rests to sustain his charge."

In considering this same provision, which is common to the workmen's compensation acts, the Texas commission of appeals (with the approval of the supreme court), in *Independence Indemnity Co. v. White*, (Tex. Com. App.) 27 S. W. (2d) 529, said:

"Sections of the various Workmen's Compensation Acts, which authorize a review of awards on the application of one of the interested parties and providing that such awards may be modified on such review, are not intended to afford a method of correcting errors made in fixing the amount of the original awards, but are designed to afford a means of enabling an employer or the employee to obtain an increase, decrease, or termination of awards because of a change in the workmen's physical condition occurring subsequent to the entry of the original awards. *Crossfield v. Tanian*, 2 Q. B. (Eng.) 629, 69 L. J. Q. B. 790; *Mead v. Lockhart*, 2 B. W. C. C. (Eng.) 398; *Corbet v. Haines*, W. C. Rep. (Eng.) 288; *State v. District Court*, 136 Minn. 147, 161 N. W. 391; *Bloomington, D. & C. Ry. Co. v. Industrial Board*, 276 Ill. 120, 114 N. E. 511; *Benton Coal Co. v. Industrial Commission*, 301 Ill. 396, 134 N. E. 37."

■■ After an award under the statute it seems reasonable to conclude, and the courts so hold, that upon application

by either party for a change or modification of the award, the burden of proof is upon the moving party. Here the board evidently thought and, by their order in effect, held that appellants had not sustained the burden of proof cast upon them by law and the rules of practice in such cases. We have examined the evidence submitted on which a modification of the award is sought and we have no hesitancy in saying that it does not support appellant's contention and, indeed, is not sufficient to justify an order changing or modifying the award.

In support of the application for modification, appellant introduced two physicians, one an orthopedic surgeon, who had seen and talked with respondent twice; first in 1934 and the second time in 1935. He testified that he found good motion in left knee, completely healed fracture, some instability in right knee, some thickening of knee joint; approximately 25 per cent disability in right knee; substantially the same in left leg; some disability in shoulder; found evidence of arthritis; one leg three-fourths inch shorter than the other.

Another physician, a professor of neurology of the University of Colorado, examined him in 1934 and also in 1935. He testified that he found no evidence of any central nervous disease; found defect in right ear, about 50 per cent; shortening of left leg (from 35 to 50 per cent as a working unit) and marked limping; well healed operation wound over the tibia; found no flail joint. Conditions relating to right leg as of 1926 were not present at time of examination; didn't notice any disability in right knee or right leg; has crooked spine sufficient to prevent him from doing heavy labor; at least 35 per cent disabled.

The testimony of this witness was, in our judgment, materially weakened by some of his own statements. His attention was called to the fact that Doctors Pittenger and Biwer of Boise examined respondent in August, 1927, and reported, among other things, that the patient was suffering from nervous disturbances due to "gliosis of the brain." Questioned about this, he testified:

"Doctor, in August of 1927 the record will show that Mark Boshers was examined by Dr. Fred Pittenger and Dr. Biwer,

of Boise, Idaho, and that as a result of said examination certain injuries and disabilities appeared, whereby there was an agreement and award of the Industrial Accident Board that he was totally and permanently disabled;—that one of the statements of Drs. Pittenger and Biwer was: 'In our judgment this man has a total disability as compared to the loss of both feet, by virtue of the various central nervous system disturbances undoubtedly due to gliosis of the brain.' Doctor, I will ask you, please, whether in your examination of Mr. Boshers you took into consideration any possible disease of the central nervous system or any possible gliosis of the brain, and if so, what your observations were?

"A. I examined him principally for the purpose of determining whether there was any organic disease of the brain, spinal cord, or peripheral nerves. I found no evidence of any central nervous disease.

"Q. What is gliosis of the brain, if that is the proper pronunciation?

"A. Gliosis of the brain is a rather indefinite term. It signifies usually a hardening of the structural elements of the brain.

"Q. Is that evidenced by symptoms?

"A. The term itself is obsolete. I really don't know what is meant by the term gliosis of the brain, except the term itself means a hardening.

"Q. Well, then, Doctor, assuming that when Drs. Pittenger and Biwer examined Mr. Boshers in 1927, they found various central nervous system disturbances, and then assuming that you found none in your examinations, would that indicate that there had been a change in Mr. Boshers' condition in 1927 and the time of your first examination in 1934?

"A. It would."

On cross-examination he testified:

"Q. Dr. Delehanty, you state that this term gliosis is an obsolete term. Do you know how long the term has, generally speaking, been obsolete?

"A. Well, as far as my recollection goes, I have never heard it applied as a disease of the central nervous system.

"Q. Then, on that basis, Doctor, would you or would you not say that you could deduce absolutely what Dr. Pittenger or Dr. Biwer had in mind when they used the term?

"A. No, I could not.

"Q. Now, you say that you found a defect in hearing of the right ear, amounting to about fifty per cent?

"A. Yes."

Turning to Webster's New International Dictionary (1935 ed.) we find "gliosis" defined as follows: "Med. Excessive development of neuroglia"; and "neuroglia" is defined as: "Anat. The sustentacular tissue which fills the interstices and supports the essential elements of nervous tissue, especially in the brain, spinal cord and ganglia."

Again, referring to Dorland's American Medical Dictionary, (1935 ed.) we find the word "gliosis" defined as follows:

"The disease condition associated with the presence of gliomas or with the development of neuroglia tissue. *basilar g.*, gliosis affecting the brain stem, thalamus, and corpus striatum. *cerebellar g.*, gliosis affecting the cerebellum. *diffuse g.*, gliosis affecting the whole of the cerebral tissue, or widely scattered through it. *hemispheric g.*, gliosis affecting one of the cerebral hemispheres. *Hypertrophic nodular g.*, a form of gliosis in which the brain is symmetrically enlarged because of hyperplasia of the neuroglial tissue. *lobar g.*, gliosis affecting a single lobe of the brain. *perivascular g.*, a form of arteriosclerotic insanity marked by increase of the neuroglia about the diseased blood vessels of the brain. *spinal g.*, syringomyelia. *unilateral g.*, hemispheric gliosis."

Nowhere is it suggested that the term "gliosis" is obsolete nor that it is a meaningless term.

Respondent testified that he was practically in the same condition that he was in at the time the agreement was approved and final award was made; that he had been a constant sufferer; that he was unable to do any work or even to carry home his groceries. In this he was corroborated by the landlady where he had lived for about a year. He testified that he could not lift a ten-pound weight and carry it any

distance; that the only change he noted was in his left leg. In reference to that he was asked the question:

"Q. In what way would you say there has been a slight improvement?

"A. Well, it has gristled together a little bit. At that time I was wearing a brace on that leg. I have doctored it up. That is about all the improvement I can see I have gained. Right at the present time I'm not in as good condition as I was at the time of August 16, 1927."

Other facts and circumstances disclosed by the record all tend to corroborate the contention of respondent that no sufficient substantial improvement has taken place in his condition to justify a termination or reduction of the life compensation allowed by the award of August 16, 1927.

The judgment is affirmed with costs to respondent.

Morgan, C. J., and Holden, Budge and Givens, JJ., concur.