(No. 7145. December 21, 1943.)

WILLIAM R. HOWARD, Appellant, v. THE WASHINGTON WATER POWER COMPANY, Employer, and THE AETNA CASUALTY & SURETY COMPANY, Surety, Respondents.

[144 Pac. (2d) 210.]

Therrett Towles and Frank Griffin for appellant.

Harry M. Morey and W. B. McFarland for respondents.

HOLDEN, C.J.—September 18, 1939, claimant, William R. Howard, was employed by the Washington Water Power Company as a common laborer near Cottonwood, Idaho, on a line crew rebuilding a transmission line carrying an alternating current of 22,000 kw. On that day the crew was setting a pole with the aid of a truck, equipped with a

twenty-five foot boom and stiff legs, which at the time were resting on the ground. When the pole was being lowered into a hole six or seven feet deep a ground wire attached to it came in contact with the current which was transmitted to the ground through the truck. Claimant was releasing a pair of blocks at the bottom of the pole with his right hand in contact with the steel boom of the truck when part of the current passed through his body, grounding through his feet. He was rendered unconscious and immediately resuscitated by artificial respiration administered by the foreman. As a result of the accident claimant suffered second and third degree burns on his right and left feet and on the palm of his right hand and second degree burns below the right elbow.

Following the accident claimant was taken to a hospital in Cottonwood, Idaho, where he was under the treatment of a physician until September 21, 1939, when he was transferred to a hospital in Spokane, Washington, under the care of another doctor, employer's physician. He was hospitalized for approximately five weeks, remained at home for about two weeks and returned to work November 8, 1939. He was totally, temporarily disabled from the time of the accident until he resumed work November 8, 1939. Shortly after returning to work, to-wit, November 16, 1939, a summary and award was approved by the board. After his return to work, November 8, 1939, claimant continued to work for the Washington Water Power Company until January 28, 1941, at which time his wages had been raised from $20.00 per week to $120.00 per month. Claimant then worked for Max J. Kuney at a higher grade of work, namely as a ground man at $1.12½ an hour. He continued to work for Kuney for approximately a year. When he quit he was foreman receiving $1.50 an hour. Claimant went to work March 23, 1942 for the "Army Engineers" at $2,300.00 per year, with overtime in addition. His work with the Army Engineers terminated about May 10, 1943. At the time of the hearing claimant was employed by Du Pont as an inspector at $65.00 per week. February 17, 1943, claimant filed a petition for additional compensation for alleged partial disability for work from the date of the accident to the date of the filing of the petition, due to alleged wrecked nervous system. March 6, 1943, claimant filed an amended petition. In his amended petition claimant alleges his "entire nervous system was so wrecked and shattered from said accident

that after the date of the above mentioned award and after claimant resumed work his physical condition changed and as a result of said accident claimant suffers and has suffered from dizziness and fainting spells and from tremors and quivering of the right hand and foot which disturbs his sleep and causes insomnia. That claimant's heart has become affected and weakened from said accident and he is unable to withstand any excitement or exertion whatever, nor is he able to perform any strenuous or heavy work, and that as time goes on said conditions are becoming more frequent and more pronounced and claimant's ability to work is being directly and materially affected."

June 21, 1943, a hearing was had. August 11, 1943, findings of fact and rulings of law were made and filed. On the same day the following order was made and entered thereon:

"WHEREFORE, IT IS HEREBY ORDERED, that the claimant take nothing by this proceeding."

The appeal to this court is from the order.

Claimant relies for recovery of additional compensation on a change in his condition (Sec. 43-1407, I.C.A.) following the accident. He pleads in substance that his "heart has become affected and weakened from said accident and he is unable to withstand any excitement or exertion whatever"; that "as a result of said accident claimant suffers and has suffered from dizziness and fainting spells," and that his entire nervous system was so wrecked and shattered as to change his physical condition.

The burden is on the party claiming "a change of condition" to prove the change, and that such change was due to and resulted from the prior compensable accident. (Sec. 43-1407, I.C.A.; *Boshers v. Payne*, 58 Ida. 109, 114, 70 P. (2d) 391; *Fackenthall v. Eggers Pole & Supply Co.*, 62 Ida. 46, 51, 108 P. (2d) 300.)

Hence, the pivotal question presented for determination is: Did claimant prove a change in his condition by a preponderance of the evidence?

Claimant testified in substance: that after going back to work following the accident, he had three fainting spells; that his fainting spells lasted about five minutes; that one of these he had while wrestling with a fellow employee; that he suffered tremors and quivering of the right hand and foot, which disturbed his sleep and caused insomnia; that

his heart had become affected and weakened; that he was unable to stand any excitement or exertion; that he was not able to stand heavy work; that "Q. Now, Mr. Howard, when you went down there to work, when you returned to work for the Washington Water Power Company, what was your physical condition? A. Well, as I noticed, it was all right. Q. Didn't you notice any nervousness, or any tremors when you went back to work for the Washington Water Power Company? A. I might have been, but I wasn't thinking of that at the time. Q. I am not asking you what you were thinking. I am asking what you noticed—if you didn't have some tremors and heart condition when you went back to work for the Washington Water Power Company? A. No. Q. Sir? A. Not noticeably. Q. But to some extent? A. I would say yes."

F. R. Howard, claimant's father, testified: that prior to the accident appellant was a strong, healthy boy, in excellent physical condition; that he slept with claimant about a week before the hearing; that appellant's foot kept jerking; that appellant got up and walked around, drank some water, and took a smoke.

C. E. Woodside (called by claimant), under whom claimant worked, testified: that before the accident claimant's condition was good and that after the accident claimant was more nervous than he was before the accident.

N. P. Hunt, a foreman under whom claimant worked after the accident, called by appellant, testified: that one day when claimant was "scuffling with the boys," he noticed claimant was awfully nervous; that he favored appellant all he could and "would have him figure up the bills to keep him away from hard work as much as I could until he could straighten up."

Dr. Harry Goldstein, called by claimant, testified by deposition: that claimant's condition was due to an electrical shock; that he gave him bromides; that he diagnosed claimant's condition as traumatic neurosis; that in his opinion the traumatic neurosis was the result of sequela of the electrical shock; that claimant's disability was "fifty per cent as compared to a man with the loss of an arm at or near the shoulder"; that claimant's condition was not due to tonsilitis; that claimant's condition was not due to drinking coffee or smoking cigarettes; that that did not cause trau-

matic neurosis; that traumatic neurosis could happen from any injury; that it was probable the electric shock caused traumatic neurosis; that claimant was suffering from both nerves and tachycardia; that paroxysmal tachycardia is associated with neurosis; that tachycardia is a condition meaning rapid pulse; that claimant had a fainting spell in his office; that claimant's condition might show itself at the time of the accident or it might take some weeks after, "it would depend upon the man's physical ability to stand shock and injury"; that paroxysmal tachycardia is a fundamental disability; that he found nothing wrong organically with claimant's heart; that he did find something wrong fundamentally; that claimant was a husky man; that "Well, an organic condition is something which involves either the muscles or the valves or the arteries directly going to the heart. Functional disturbances can be brought on by nerve condition, anything which will unduly cause an impairment or enervation to the heart—anything that will involve the sinus node, the node of tawara, will cause a rapidity, or otherwise tachycardia, of the heart. I would like to say that tachycardia caused by infection of as long a duration would lead at this time to organic disability. An organic disability, again, would be shown by the cardiograph, and it would show more muscular destruction than a functional, or a paroxysmal, which are more or less the same thing, than tachycardia."

Dr. Donald A. Palmer, called by respondents, testified by deposition that he made heart diseases a specialty; that August 11, 1942, he made a physical examination of claimant; that "Under past history" claimant listed the usual childhood diseases; that he had had a sore throat and tonsilitis every year "for the past five years, the last being about July 1, 1942"; that "head colds had been rather frequent—two to four a year—the last one in June of 1942, at which time he had a temperature of 103"; that most of his colds were bronchial rather than head colds; that he had pneumonia in 1937; that he had influenza in 1940; that claimant "spoke of marked variability in the rate of heart beat, which had been present at intervals ever since the accident, but especially the last two years, coming on mainly after a strenuous day of work or after excitement, such as small noises, driving a car, and so forth"; that these attacks (claimant said) consisted of a very rapid beating of the heart lasting fifteen to twenty minutes; that these attacks

usually came on when he was at rest; that he was unable to run or do any strenuous work because of the fatigue and the resultant attacks; that he had smoked twenty to thirty cigarettes daily for many years; that he had been rather markedly nervous since the accident, and that these "episodes" had disturbed his sleep; that claimant appeared healthy; that his "nose appeared slightly injected. The teeth were in good repair. The tongue was smooth and moderately coated. The pharynx was infected, which is commonly seen in smokers. The tonsils were very large and injected"; that by "injected" he meant "inflamed—reddened. The head and neck were otherwise normal. On both physical and fluoroscopic examination the heart was perfectly normal in size and shape. The lungs were clear. The diaphragms moved normally. The blood pressure was 136 systolic and 86 diastolic. The pulse rate was 116 and regular. Examination of the abdomen was negative. Examination of the genitalia was negative. The extremities were normal except for the scars"; that "My conclusion was that—my diagnosis was definitely infected tonsils, irritated throat, a heart which was to objective examination entirely normal"; that "Q. . . . Now then, Doctor, I am going to ask you as a physician and specialist in heart diseases what are the causes of tachycardia? A. There are many causes. The most common causes are excessive smoking—excessive tobacco I mean; excessive coffee; pressure against the heart from gas; focus of infection such as infected tonsils or teeth; and then there is quite a number in which the cause is never known"; that "smoking cigarettes could start an attack of tachycardia, which in turn could cause fainting; that tachycardia is very common from excessive smoking. I say the result of it."

To entitle claimant to recover, the burden was upon him to prove by a preponderance of the evidence that the electrical shock was the cause of his alleged present condition. On the question as to whether his condition, whatever that may be, is due to the electrical shock or to other causes, it will have been noted that Doctors Goldstein and Palmer rather flatly contradict each other. Doctor Goldstein testified claimant's condition was not due to tonsilitis, drinking coffee or smoking cigarettes, but was caused by the shock. On the other hand, Dr. Palmer testified claimant's condition was due to infected tonsils, infected pharynx caused by excessive smoking (20 to 30 cigarettes daily for many

years) and to drinking coffee to excess and not to the shock. The doctors were agreed there was nothing organically wrong with claimant's heart; hence, the electrical shock could not have actually physically injured the heart. To Dr. Palmer, who gave claimant a very thorough physical examination, appellant appeared healthy, and even Dr. Goldstein, claimant's physician, testified that appellant was a "husky man." Of course, claimant himself would not be able to determine the cause of his trouble. That, necessarily, must be left to physicians to determine. Dr. Goldstein is a general practitioner while Dr. Palmer is a heart specialist. In weighing the evidence of these two physicians we are taking that fact into consideration. We are, furthermore, also taking into consideration these facts and circumstances disclosed by the record; claimant had only three fainting spells in about three years and nine months, and they do not appear to have been serious; that his fainting spells lasted only about five minutes, and also that claimant, conceding, as he contends, that his work was lighter, was, nevertheless, almost continuously employed after the accident, with a substantial increase in wages from time to time. From all of which it is rather difficult to believe, as appellant insists, that his "entire nervous system" was "wrecked and shattered."

As above pointed out, these physicians testified by deposition. Where witnesses do not appear before the Board and testify and thus give the Board an opportunity to hear and see them, it is our duty to examine the evidence and determine its value. (*Webb v. Gem State Oil Co.*, 56 Ida. 465, 474, 55 P. (2d) 1302; *Phipps v. Boise Street Car Co.*, 61 Ida. 740, 747, 748, 107 P. (2d) 148; *Ida. Pwr. Co. v. City of Buhl*, 62 Ida. 351, 355, 111 P. (2d) 1088.)

We conclude claimant failed to prove by a preponderance of the evidence that as a result of the electrical shock he sustained an injury "fifty per cent as compared to a man with the loss of an arm at or near the shoulder."

The order of the board is affirmed, with costs to respondents.

Budge, Givens and Dunlap, JJ., concur.