668 P.2d 1000

**Candice MONROE, et al., Claimants-Appellants,**

v.

**Leroy B. CHAPMAN, et al., Defendants-Respondents.**

No. 14041.

Supreme Court of Idaho.

Aug. 24, 1983.

Dean E. Miller, of Gigray, Miller, Downen & Weston, Caldwell, John F. Greenfield, George A. Greenfield, of McClenahan & Greenfield, Boise, for claimants-appellants.

Paul S. Boyd, John W. Barrett, and Michael G. McPeek, of Moffatt, Thomas, Barrett & Blanton, Chartered, Boise, Michael E. McNichols, Orofino, Alan K. Hull, of Quane, Smith, Howard & Hull, Boise, for defendants-respondents.

DONALDSON, Chief Justice.

■ Claimants-appellants filed an application for a hearing with the Industrial Commission in the form of a class action claim for named individuals and those similarly situated. The claimant class was allegedly entitled to or was to become entitled to increases in workmen's compensation death benefits under I.C. §§ 72–409 and 72–413. The defendant class was allegedly comprised of those sureties or self-insured employers who have incurred or will incur a responsibility to pay workmen's compensation death benefits. The Industrial Commission filed an order which adjudged and decreed that the Industrial Commission does not have the authority to entertain a class action type proceeding.[1] Claimants-appellants appeal. We affirm.

The issue presented on appeal is simple—whether the Industrial Commission has the authority which must be exercised to entertain a class action type proceeding concerning a controversy arising under the Idaho workmen's compensation law.

■ The Industrial Commission has broad jurisdiction under the workmen's compensation law. I.C. § 72–707. I.C. § 72–707 provides:

"All questions arising under this law, if not settled by agreement or stipulation of the interested parties with the approval of the commission, except as otherwise herein provided, shall be determined by the commission."

However broad, subject matter jurisdiction does not mandate that specific procedural devices be available or employed. The sole issue on appeal concerns procedure before the Industrial Commission. A class action under a rule such as I.R.C.P. 23 is a procedural rule to permit one or more members of a class to sue or to be sued as representative parties on behalf of all members of the class. It does not relate to the subject matter jurisdiction of the issues presented by the case, but relates only to how those issues may be presented to the adjudicatory body. The workmen's compensation law does not specifically mandate that the Industrial Commission entertain class action proceedings. Proceedings before the Industrial Commission "shall be as summary and simple as reasonably may be and as far as possible in accordance with the rules of equity." I.C. § 72–708. The Industrial Commission has been granted the "authority to promulgate and adopt reasonable rules and regulations for effecting the purposes of this act." I.C. § 72–508.

■ The Industrial Commission has the power to adopt a rule which would permit a class action proceeding before it, but the fact remains that it has not chosen to adopt such a rule. I.C. § 72–508. Because this inaction does not constitute a denial of due process, we refrain from disturbing the commission's order.[2] Affirmed.

No costs on appeal.

No attorney fees on appeal.

SHEPARD and BAKES, JJ., concur.

HUNTLEY, Justice, with whom BISTLINE, Justice, concurs, dissenting.

The action taken by the Industrial Commission below, and this court's sustaining of that action constitute a most remarkable failure in the performance of our respective duties.

The claimants, who are widows and descendants of deceased workers entitled to death benefits, instituted a class action before the Industrial Commission. The Industrial Commission, having not only specific statutory rulemaking authority, but also the inherent power of any judicial or quasi-judicial body to conduct the case brought

---

1. In substance, the order of the Industrial Commission which "ORDERED, ADJUDGED and DECREED that the Industrial Commission does not have authority to entertain a Class Action type proceeding" functioned as a dismissal on jurisdictional grounds and therefore was a final order of the Industrial Commission properly appealable to this Court. I.A.R. 11(d).

2. We do not address the merits and note without deciding that the individual claimants may yet obtain relief under I.C. § 72–719.

Also in a proper case, involving a decision upon the merits by the Industrial Commission, an appeal may lie to this Court pursuant to I.C. § 72–724 wherein the statutory provisions relating to death benefits under the workmen's compensation law could be reviewed.

before it, simply threw up its hands, saying in effect: "We have no rule book to tell us how to proceed and therefore we will not entertain your cause of action."

The workmen's compensation statutes were amended in 1971 to provide that death benefits would be adjusted upward or downward annually to reflect the change in the average state wage. Claimants allege as their cause of action that since 1971 the compensating sureties, with the apparent official sanction of the Commission, have refused to pay the additional benefits.

The determination of whether the additional benefits are payable is a complicated legal matter. Even though the amount at stake to the insurance industry and self-insured employers is in the hundreds of thousands of dollars, no one individual claimant has a claim significant enough to justify the expense of bringing an action.[1]

Class actions did not come into being as a result of a narrow judicial thinking which defined its potential means for carrying out its responsibilities solely in terms of existing, and often inadequate, procedures. It is almost a truism that law depends for its survival on its ability to adapt to the ever-changing complexion of society. That adaptation is made possible by a view towards the purposes for which judicial and quasi-judicial bodies exist, and not by a view inflexibly focused on the rules by which those bodies presently operate. Class actions exist because of a need for justice in a unique class of cases, which need could not be met but for modification of existing judicial procedures. A failure to adapt would have resulted in a failure of justice as to that class of cases.

In the instant case, the Industrial Commission is not being asked to pioneer a new theory of law. Rule 23 is a useful model for such procedures. The Commission has lawyer hearing examiners and one lawyer commission member; with a "can-do" attitude a procedure to handle this case could be worked out between counsel and the Commission in a brief conference. Nothing more would be needed than for the Commission to advise the attorneys that it will entertain the class action, and to direct that the attorneys appear with proposals as to how to proceed in this particular case.

It appears that this case would be the simplest class action to manage that one could envision. The class is fixed and certain, the Commission has files on all of the deceased workmen, and the sureties by virtue of the fact that they are making current monthly payments have present addresses of all the class members. This case is a shameful display of bureaucratic inflexibility, both by the Commission in its failure to carry out its assigned duty of handling the litigation before it and in the failure of this court to exercise positive direction as it is required to do as the head of the judicial system.

Idaho Constitution art. 5 § 2 states in part:

"The courts shall constitute a unified and integrated judicial system for administration and supervision by the Supreme Court."

The one positive aspect of our decision today is that it points the way to reducing the congestion of the courts—we need only repeal our rules of procedure in areas where we would prefer to reduce our caseload. We could thus avoid our responsibilities by advising the public that justice is "not available" because we have no rule under which to proceed.

BISTLINE, Justice, dissenting.

The majority opinion sees the issue presented as being "simple," declaring the issue to be "whether the Industrial Commission has the authority to entertain a class action . . . ." The majority concludes that "[t]he Industrial Commission has the power to adopt a rule which would permit a class action proceeding . . . ." It affirms the order appealed from because the Commission "has not chosen to adopt such a rule." In making such a simplistic disposition of

---

1. A comprehensive statement of factual background is set forth in the reply brief of the claimants at pp. 3–14, attached hereto as appendix A.

this extremely important appeal, the majority thus avoids giving any consideration whatever to the underlying issue.

The best which can be said for the majority opinion is its footnote concession that the real issues could be reached "in a proper case." This may well be considered as the epitome of judicial arrogance—where Justice Huntley has well pointed out that "no one individual claimant has a claim significant enough to justify the expense of bringing an action." Not one of the three-member majority deigns to make even the slightest response to his statement.

The *ratio decidendi* of the majority opinion, although it will disturb the trial bench, will not be any huge surprise. For a court which is enamored of its own rules to dispose of this momentous case on such a slender reed as the Commission's failure to have promulgated a class action rule is, perhaps, understandable—but totally unacceptable. The majority seemingly remains unmindful of the fact that while some rules are made in the abstract, others come from precedential decisions. For instance, in *Minich v. Gem State Developers, Inc.,* 99 Idaho 911, 591 P.2d 1078 (1979), a majority of this Court decided to expand the award of attorney's fees under I.C. § 12–121 to apply to appeals, and then, without hesitation, proceeded to set the guidelines under which such fees would be awarded. *Minich,* 99 Idaho at 918, 591 P.2d 1078. Can a court, which could so do that which the legislature did not do, today refrain from doing that which the Industrial Commission did not do? I think not. At least, not with good conscience regard for the rights of those who are this day not given recognition—as Justice Huntley has stated. And, were some benefactor to bankroll a "proper case" as the majority suggests, this would entail going all the way back to "Start" for the many claimants who are not receiving that which the law says belongs to them, a good share of whom are most likely uninformed that they may be being short-changed.

Our Idaho Constitution, Art. 1, § 18, declares that our "Courts of justice (and I

assume that this was thought to be one) shall be open to every person, and a speedy remedy afforded for every injury of person, property, or character . . . ." The only court that those people can gain access to happens to be this, the Supreme Court of Idaho. Today it ignores the Constitution which created it, and, ironically does so on the supposed hypothesis that "this inaction [on the part of the Industrial Commission] does not constitute a denial of due process . . . ."

Where the majority in a single breath advises the Industrial Commission that it does have the authority which the Commission declared it did not have, it makes no sense that this Court is not today telling the Commission to get on with the business of continuing the action which has been brought. Even long before the recodification of the Industrial Accident Statutory law in 1971, which included a provision for the use of depositions in workmen's compensation cases, I.C. § 72–601,[1] depositions were taken and used—this Court voicing no objection. *Chambers v. State,* 59 Idaho 200, 81 P.2d 748 (1938); *Howard v. Washington Water Power Co.,* 65 Idaho 339, 144 P.2d 210 (1943). In those days, no rule was thought necessary to make common sense use of depositions, even though not provided for in the Code of Civil Procedure, or this Court's rules. There is absolutely no reason for this Court to not direct the Industrial Commission that, in the absence of a rule, or until it promulgates one if it chooses to do so, it apply the provisions of I.R.C.P. 23.

## APPENDIX A

### B. HISTORY

1. THE REVISION OF THE IDAHO WORKMEN'S COMPENSATION STATUTES AND THE CREATION OF THE COST OF LIVING ESCALATOR.

During the 1971 session of the Idaho Legislature, the workmen's compensation and occupational disease law of Idaho under-

---

1. This section as amended is found in I.C. § 72–709.

went a much needed major revision. *See* "Compiler's Note" to Section 72–101, *Idaho Code.* The statutory framework had not received a comprehensive review since the original enactment in 1927. Many provisions needed revision, codification, or recodification in order to bring Idaho's statutory workmen's compensation system up to date.

One fact of modern life was immediately recognized as a problem by the draftsmen of the 1971 revision, as well as by the legislators who enacted the revision. That fact was the unstable, generally rising cost of living. This troublesome aspect of modern day American economics was beginning to wreak havoc with fixed benefit programs like the long term total disability and death benefit provisions of the State's workmen's compensation system. Inflation and the constant rise in the cost of living were picking the pockets of totally disabled workmen and their families, and the families of the deceased workmen, in a way which had not been contemplated by the architects of the 1927 law. By 1971, the problem had accelerated to the point that yearly legislative benefit revisions appeared necessary to keep abreast of the cost of living.

The 1971 Legislature responded by establishing, in the revised workmen's compensation act, an automatic benefit escalation system which was to be structured on the annual rise in Idaho wages. The system was devised to work as follows:

The "average weekly state wage" was to be computed once each year by the Idaho Department of Employment. Idaho employers were required to submit their wage and hour statistics to the Idaho Department of Employment at the first of each December. The Department would then utilize the figures to compute the average weekly state wage. By December 31st of the same year, the Department would release the final figure of such computations, which figure, in turn, would serve as the basic element in calculating workmen's compensation disability and death benefits for the

subsequent year. *See* Section 72–409, *Idaho Code.*

The escalation system was to apply to two of the three categories of total disability cases. It *would not apply* to cases of temporary total disability in which the workman became less than totally disabled within 52 weeks of the date of his injury or the date his occupational disease became totally disabling. It *would apply* to such cases of temporary total disability where the disabled workman still found himself totally disabled after 52 weeks. It *would also apply* to cases of permanent total disability.

With temporarily total disability cases running over 52 weeks, the workman would receive 60 percent of his average weekly personal wage for the first 52 weeks, then receive 60 percent of the "average weekly state wage" for each week he was temporarily totally disabled after this point. With permanent total disability cases, the workman would receive 60 percent of his average weekly personal wage for 52 weeks, then receive 60 percent of the "average weekly state wage" for each week thereafter for the rest of his life.

In either the temporary total case going past 52 weeks, or the permanent total case, the worker would receive a boost or a cut in his benefits once the average weekly state wage formula applied. However, in January of each succeeding year the workman would receive an adjustment in accordance with the annual change in the average weekly state wage. Although the adjustment could theoretically mean a cut in the disabled workman's weekly benefit, this has never been the case since 1972. According to statistics provided by the Idaho Industrial Commission, the following figures, rounded off to the dollar, represent the "average weekly state wage" utilized by the Commission for compensation purposes since the enactment of the cost of living adjustment for each indicated year:

| | |
|------|---------|
| 1972 | $118.00 |
| 1973 | $124.00 |
| 1974 | $130.00 |
| 1975 | $138.00 |

| 1976 | $150.00 |
| 1977 | $165.00 |
| 1978 | $183.00 |
| 1979 | $193.00 |
| 1980 | $202.00 |
| 1981 | $220.00 |

(Source: Idaho Industrial Commission)

With the application of the automatic escalation system, the totally disabled workman, away from his job and the ability to bargain for an increase in pay, or receive such an increase if one was given, was assured an increase for cost of living by the mechanical operation of the adjustment system. It was an equitable, indexed, progressive mechanism critically needed for fixed income programs subject to the turbulent modern economy. Totally disabled workmen would no longer have to see their disability benefits eaten alive by inflation while helplessly watching from a wheelchair or hospital bed.

2. APPLICATION OF THE COST OF LIVING ESCALATOR TO WORKMEN'S COMPENSATION DEATH BENEFITS.

The automatic cost of living escalator, however—*and this is the major substantive issue in this lawsuit*—was not intended to apply only to totally disabled workmen. Section 72–413, *Idaho Code,* clearly extended the escalator to recipients of workmen's compensation "death benefits" as well. The 1972 act was clear: When an Idaho workman was killed on the job, or died from an occupational disease, his (or her) surviving spouse and other dependents were entitled to specifically enumerated death benefits under the revised law. These benefits were to be calculated by utilizing the same automatic adjustment system provided for total disability cases.

The rationale for applying the cost of living escalator to death benefits is obvious to the most casual observer. A family's need for inflationary protection for payments in lieu of lost wages would be just as great if its breadwinner was deceased as it would be if he were totally disabled. To put it another way, one can hardly be more permanently disabled than dead. This Court needs only to conduct a simple reading of the death benefit statutes. These statutes are completely unambiguous in applying the cost of living adjustment to death benefits.

Under Section 72–413, *Idaho Code,* death benefits are fixed at a specific number of weeks for each dependent. A maximum of 500 weeks is established for each dependent. Benefits are also fixed in various percentages of the average weekly state wage for various classes of dependents. Finally, all figures for death benefits, fixed to this point in terms of weeks and percentages of the average weekly state wage, are then required by that same section to be multiplied by the "average weekly state wage *as defined in Section 72–409*". Section 72–413, *Idaho Code.* (Emphasis added.)

The definition of the "average weekly state wage" in Section 72–409(2), *Idaho Code,* a term of art by any accepted method of statutory construction, describes an adjustable figure along with the mechanical computation system to be utilized in calculating the annual adjustment.

3. REFUSAL OF DEFENDANTS TO PAY COST OF LIVING INCREASE TO DEATH BENEFIT RECIPIENTS.

There would seem to be no argument that the adjustment system applies to death benefits. As aforementioned, the statutes appear precise and unambiguous; yet, for the past nine years there has been a wholesale refusal on the part of workmen's compensation sureties and self-insured employers to pay the annual adjustment when issuing death benefits. Inexplicably, death benefits, since the effective date of the new law, have never been paid in accordance with the above described statutory formula. Instead, surviving spouses and dependents of deceased workmen have been paid death benefits computed *at the average state wage prevailing on the day the workman died.* No adjustment has thereafter been made at the first of the year following the workman's death as law provides. This systematic denial of benefits has been disastrous for survivors.

For example, in a case where a maximum number of 500 weeks (nearly 10 years) is payable to, say, a surviving wife, and that surviving spouse is still entitled to receive benefits for the 1973 death of her husband, we find, in 1981, that the surety or self-insurer is still paying the hapless woman at the 1973 rate. She must buy groceries and pay for other necessities of life at whatever cost the 1981 economy dictates, but must make do with death benefits figured at the average weekly state wage prevailing in December of 1972.

Workmen's compensation sureties and self-insured employers have taken the position that a claimant's death benefits are frozen at the average weekly state wage utilized for workmen's compensation purposes during the year the respective workman died. Without known exception since 1972, Idaho's workmen's compensation sureties and self-insured employers have paid death benefits to entitled dependents in accordance with this certainly erroneous theory.

At this point, it must be noted that no claimant who has received a lump sum payment for the death of a workman—and such claimants are few in number—is a part of the claimant class in this class action. This action is brought by and on behalf of claimants who have received, are presently receiving, or will receive death benefit payments on a periodic basis. The members of the defendant class are only those sureties and self-insured employers who have paid, are presently paying, or who potentially would pay death benefits without including the annual cost of living adjustment required by law.

4. SUPERFLUOUS, UNLAWFUL, UNENFORCEABLE DEATH BENEFIT COMPENSATION AGREEMENTS PREPARED BY DEFENDANT SURETIES AND SELF-INSURED EMPLOYERS; UNLAWFUL APPROVAL OF SUCH AGREEMENTS BY IDAHO INDUSTRIAL COMMISSION: THE VICIOUS CIRCLE.

A. THE "COMPENSATION AGREEMENT."

As indicated above, the method *generally* used by the defendant sureties and self-insured employers to avoid payment of the cost of living adjustment is a subject which does not immediately appear to be relevant to determining procedural jurisdiction in this case. However, it is highly relevant. A substantial discussion of the practice, which involves the use of written "compensation agreements" and Industrial Commission "awards," will place the lawsuit in better perspective, particularly with regard to the absence of original or other jurisdiction in the district court and the probable impropriety of appellate jurisdiction in the Idaho Supreme Court. More importantly, it will help illustrate why the class action is the only way the substantive question will ever get a hearing. The appellants respectfully request that the members of this Court bear in mind, during their review of the "compensation agreements" and "awards," the breadth of the class action claim for injunctive and declaratory relief. Specifically, the appellants urge the Court to remember that their request for "equitable restitution incidental to such relief," while important, is merely incidental to the major injunctive and declaratory trust of this action. The past benefits withheld, while totalling millions of dollars, pale in comparison to the benefits which would be denied in the future should the systematic denial continue.

Since January 1, 1972, almost every workmen's compensation surety or self-insured employer which has become required but has refused to pay statutory cost of living adjustments to death benefit recipients, has obtained a measure of official sanction for such misconduct. It has done so in the following manner:

The surety or self-insured employer drafts a death benefits "compensation agreement" which specifically excludes payment of the adjustment. This surety or self-insured employer then obtains, on the "agreement," the signature of the entitled dependent, usually the surviving wife sign-

ing on behalf of herself and as guardian of minor children. It should not go unnoticed that the signature of the surviving spouse is usually obtained in a moment of grieving and at a time when she and her family are most in need. After completing the "agreement" by adding its own endorsement, the surety or self-insured employer presents the "agreement" to the Industrial Commission for its approval in accordance with Section 72–711, *Idaho Code.*

In each of these "agreements" the surety or self-insured employer initially acknowledges the industrial death of the dependent's breadwinner. The appellants believe that, at this point, no "agreement" regarding the amount of benefits would have legal significance since this matter is governed entirely by statute. Nonetheless, the "agreement" invariably goes on to state the amount of compensation owed, which amount is measured in accordance with the surety's or self-insured employer's self-serving and erroneous "interpretation" of the death benefits law.

Such an "agreement" invariably acknowledges the names of the entitled dependents, cites the maximum number of weeks to which each dependent is entitled to death benefits, cites the specific amount to which each dependent is entitled per week *on the date of death of the workman* (which date is generally within the same year the agreement is devised), then lists a lump figure which represents the maximum total of benefits the surety or self-insured employer would have to pay to the respective dependents as a whole; that is, the outside dollar liability of the surety or self-insured employer given any possible set of circumstances. Presumably, the lump figure also serves as the surety's or the self-insured employer's "reserve" for the purposes of state and federal insurance laws.

The problem, of course, is that the adjustment mechanism of Section 72–409, *Idaho Code,* is not cited or utilized in such agreements. Thus, the lump, or "reserve" figure, which almost every one of these "agreements" specifically states to be the maximum collective benefit allowed under the Idaho Workmen's Compensation Law, is al-most always a deficient amount. Admittedly, the death benefit cost of living provision makes it problematical for the surety or self-insured employer to determine, with perfect accuracy, what its reserve figure would be in a death case. This is because there is no precise way to gauge the increase in the average weekly state wage for 500 weeks. This problem, however, is not beyond the reasonable capacity of the insurance industry, nor is it the sort of problem which is unknown to the industry. Prediction is an integral part of the insurance business; witness the everyday work of the insurance actuary, whose very job involves the careful calculation of life expectancy. His company uses his empirical predictions to set life insurance premiums.

Whatever difficulties lie for the insurance industry in predicting the probable increase in the average weekly state wage of Idaho, such difficulties cannot excuse sureties and self-insurers from paying the cost of living adjustment for death benefits provided by the Idaho Workmen's Compensation Law. Concomitantly, the proper calculation of insurance premiums, or past mistakes in calculating them based on the misapplication of a set of clear and unambiguous statutes, should not be shoved onto the shoulders of the unfortunate beneficiaries of such statutes. Whether past adjustments have been withheld through mistake or misconduct, the surviving dependents of deceased workmen should not be paying the price.