VÍCTOR FELICIANO FIGUEROA, Petitioner, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, Respondent.

No. 563. Decided December 18, 1961.

190

*Stanley L. Feldstein* for petitioner. *Donald R. Dexter* for respondent.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

The laborer, petitioner herein, sustained a labor accident on July 13, 1956, when he fell from an altitude of 25 feet from the gangplank of a ship injuring his left leg. He was assisted at the State Insurance Fund, and on August 7, 1956 he was discharged as cured without disability. The laborer appealed to the Industrial Commission which, in view of the reports of its doctors, ordered the Fund on August 29, 1956 to give further medical treatment to the petitioner. The X-ray plates on that date disclosed that he had periostitis of the upper third of the left femur. On November 15, 1956,

he was again discharged by the Fund without disability. He appealed to the Commission alleging that he could not work and requested determination of his disability. The medical examination disclosed that he had a calcified hematoma of the left femur and a slight atrophy of the thigh and moderate limitation of the flexion of the leg on the knee. On December 21, 1956, the Commission entered an order which it afterwards amended on January 4, 1957, fixing a disability equivalent to the loss of 10 per cent of the physiological functions of the left leg on or above the knee. The laborer moved for reconsideration, which was denied on the ground that it had been untimely made.

In some way which does not appear in the record, the petitioner appealed to the Fund, and there appears in the record a report from Dr. J. M. Quiñones, dated March 6, 1957, setting forth that he did not find atrophy nor anatomical deformity and that the movements of the left leg were completely normal, although the laborer claimed that he felt pain on that leg, and that there was no recidivism from the accident sustained on July 13, 1956. The laborer appealed from this determination to the Industrial Commission, and in view of his insistence that he felt much pain and malaise on his left thigh, he was referred to orthopedist Dr. Aníbal Lugo for examination. On April 3, 1957, Dr. Lugo submitted a report to the Commission setting forth that the laborer limped and walked with the aid of a cane. He presented atrophy of one inch of the muscles of the thigh and the flexion movements in the thigh were limited. He recommended that he could be helped by some physiotherapy.

On June 3, 1957, after holding a public hearing and receiving evidence, and it appearing from the X-ray plates that he had periostitis of the left femur with calcified hematoma and that the laborer claimed that he felt a sharp pain, the Industrial Commission ordered the Fund to give him medical treatment until he was completely cured.

There is a medical report of the Fund dated July 16, 1957, ruling that the laborer presented the same disability as that determined on December 21, 1956 by the Industrial Commission, which apparently brought the treatment ordered to an end. The petitioner appealed from this ruling to the Commission alleging that he was suffering total paralysis and disability of the left leg which disabled him for work and could not walk without the aid of a cane. He was again referred to orthopedist Dr. Lugo for examination. On August 15, 1957, Dr. Lugo submitted a report indicating that the man still limped and complained of weakness and pain on the lower left limb affected, and that the measurements still showed considerable atrophy of the muscles of the entire limb. Dr. Lugo was still of the opinion that the leg could be strengthened by proper physioteraphy.

On September 19, 1957, after holding another public hearing, the Commission again referred the case to the Fund and ordered that the medical treatment recommended by Dr. Lugo be given. On November 15, 1957, the Fund issued a medical report stating that the treatment ordered had been given, ratifying the disability of 10 per cent allowed. The laborer again appealed from such ruling to the Commission, alleging not only that he was not cured but also that his health was failing to the point that he could not walk. On December 27, 1957, the Commission confirmed the ruling on disability. The laborer moved for reconsideration enclosing with his request a medical report from Dr. Julio Lergier, of the Department of Health, Education, and Welfare of the Social Security Administration, which was admitted in evidence at a subsequent hearing and which diagnosed the loss of 75 per cent of function of the left leg, 90 per cent atrophy of the muscles of the left leg, 80 per cent loss of the function of the left hand, chronic periostitis in the left femur. According to this report, which is dated January 8, 1958, the laborer is totally and permanently disabled. On January

28, 1958, the reconsideration sought was denied, and on February 25, 1958 the Commission ratified the same upon disposing of a second motion for reconsideration made this time through an attorney.

There is another medical report of the Fund dated June 4, 1958, to the effect that there was no evidence of reactivation of periostitis, wherefore there was no recidivism. The laborer appealed from this ruling and, having been re-examined, the doctors determined as follows: "In view of the progressive atrophy, and taking also into consideration that the upper left limb now appears to have a limitation in the elevation of the arm over the shoulder, an evaluation by the neurosurgeon of the State Fund is necessary." In consonance with that ruling, on June 19, 1958 the Commission again referred the case to the Fund.

On July 23, 1958, the medical adviser of the Commission, Dr. A. Oliveras Guerra, referred the case to Dr. Ricardo Cordero for examination and report. Dr. Cordero submitted his report on July 24, 1958, setting forth that the laborer had appeared with the aid of two crutches and that even then he could hardly walk, and that every movement was a contortion indicative of intensive physical suffering. The neurologic examination revealed: "appreciable muscular atrophy of the left leg, with a circumference of two inches less than the other at the level of the middle third of the thighs and of one and one fourth inch at the level of the middle third of the calves. Practically total loss of the spontaneous motility in the left leg. Absence of pain sensation on touch and vibrations in both extremities and the corresponding half of the trunk in the left half of the body. Live and similar tendinous and plantar reflexes in the lower extremities; live and similar osteotendinous reflexes in the upper extremities. Does not present pyramidal signs. Very intensive pain upon passive movements produced in the left leg. Comment: as may be seen, the patient presents appreciable psy-

chofunctional changes resulting from a traumatic experience. I believe he should be referred to a psychiatrist."

In view of that report, the petitioner was referred to the Fund to be examined by the psychiatrist, which the Fund refused to do in the belief that it was unnecessary in the opinion of its doctors, and thereupon the Commission on September 17, 1958 referred the case for examination and report to psychiatrist Dr. Arturo Flores Gallardo. After making detailed remarks with respect to the laborer—among them the statement which the worker made to him in describing the accident while walking down the gangplank with a pail of water in the hand, that "I had a narrow escape; a few days ago an American was killed on that gangplank"— Dr. Flores Gallardo stated the following: *"Impression:* The injured, Víctor Feliciano Figueroa, has at present a conversion reaction (hysteria) manifested by alleged absence of sensation in the left leg, diminution of energy in the left arm, and inability to move the left leg. It may be said that the accident sustained on July 13, 1956 had been the nucleus for the development of this conversion reaction. Apparently, Feliciano was experiencing poor financial conditions at the time of the accident. It is well to recall that two months prior to the accident he became father to the sixth child. It may be said that the blow sustained by the injured party is not the cause of his present symptoms, but that it has served as the vehicle for the manifestation of his conflicts. The prognosis is very bad."

In view of the foregoing transcript, on October 21, 1958 the Industrial Commission entered an order to the effect that, "in view of the fact that the neurosurgeons and psychiatrists of the State Insurance Fund as well as those of the Industrial Commission are of the opinion that the laborer's condition is not a result of the accident," the decision of the Manager of the Fund is affirmed. Reconsideration having been requested, the Commission set a hearing for December 10, 1958 at which evidence was heard.

At the hearing the laborer testified that when he fell from the gangplank he remained hanging with his leg caught in one of the cross boards, receiving injuries on the left hip and thigh, inguinal region, and the knee; that he had not been able to work since the accident, had always felt a bone which pricked him there, pointing to the crest of the left ilium, and did not permit him to stand firmly; that that prick prevented him from making any effort, and that if he did the bone deadened the leg and he had to drag it; that he has to use crutches all the time for anything and that he keeps them beside his bed because he can not take a step without them; that he was alright before the accident, his health was good, worked in the open sea passing and jumping from lighter to lighter, worked during all the shifts assigned to him and some times during the "suicide shifts" from twelve midnight to six in the morning.

The laborer's wife testified that they had been married 14 years; before the accident her husband was very healthy, had no ailments, worked all the time; he had never had any disease; that his mind was good; after the accident he has been quite ill, suffering, has not worked a single day; that he always uses the crutches and can not get out of bed by himself. Since the accident her husband can not walk and is mentally ill, claiming that his brain hurts much, and that when he was sitting a long time and took some steps that he had a "complication" in the brain and felt very sick and complained much.

Dr. Arturo Flores Gallardo testified and elaborated on his report. He said that upon examination of the laborer he found him in good contact with the reality, well orientated, and that there were no symptoms of suffering from psychosis. That he had concluded that he had a conversion reaction, commonly known as "hysteria," manifested by the alleged absence of emotions in the left leg, diminution of the strength in the left arm, and inability to move the left leg. The blow

was not the cause of the conversion hysteria, but merely served as a vehicle for the manifestation of his conflicts, explaining that that meant that the blow was as an excuse for the laborer to displace internal emotional conflicts. In defining the term conversion hysteria, he explained that it was a reaction in which certain internal conflicts are displaced to the body, to that part which is weakened by the voluntary system and where there was no organic cause to account for such symptoms. Upon being asked whether such reaction was a subjective or objective manifestation, the doctor said that the laborer *feels it,* that is, that *to him it was a real and true condition,* and that in his present condition the laborer could not work. He could use the right hand and the left hand to a certain extent. Although a person suffering from a conversion reaction is not psychotic, *he is abnormal,* and such reaction may be an impediment for work. He did not know the laborer before the accident, but according to information, he worked and earned his living and got along well with people. The doctor said that his hysterical reaction is not the result of trauma, *but that it may appear* and *develop* or *evolve* with the trauma. He explained that in stating in his report that the accident has served as a "nucleus" to the development of this reaction, he used the term in the sense of vehicle. The blow was the vehicle for the development of the reaction. By definition, such reaction did not exist before the blow, but the bases did exist, the reaction clinically, as known to the doctors, manifested itself after the trauma.

In stating in his report that the blow was not the "cause" of the present symptoms, he explained that the "cause" of a conversion reaction is a psychological, emotional cause, and that the blow had nothing to do with the cause. In concluding that the prognosis was very bad, he meant to say that the chances that the injured party could walk without crutches, that he could walk again, or that he could recover

what he claims he has lost, the lack of sensation in the left leg, were very poor and that it was likely that the laborer's condition would be like that the rest of his life, and that at present the condition was one of total disability. He also explained that from the casuistic point of view, "cause" as used in his report was not causal connection, and that in the medical sense he meant by cause internal conflict and not that thing or manifestation which directly produces a particular result.

Dr. H. Vázquez Milán testified that the Manager had determined a disability of 10 per cent of the left leg above the knee due to traumatic periostitis, and that other examinations were made from which it did not appear that that condition was aggravated, but that since the laborer claimed that he had pain in the left shoulder and arm and the trauma was in the lower limb, they thought that an examination by a neurosurgeon was necessary for the evaluation of the neurodynamic system. The neurosurgeons recommended the intervention of a psychiatrist in the belief that the condition was rather psychofunctional. Dr. Vázquez Milán stated that on different occasions, in cases similar to this in which there has been trauma of the nature suffered by the laborer leaving a symptomatology resembling in a certain way a psychofunctional aspect of the condition which the laborer presented that day and in the past months, it is difficult to reach a categorical conclusion for determining to what extent this condition could, directly or indirecly, be connected with the accident, wherefore the Commission was bound to determine whether the said medical reports pointed to a condition of conversion hysteria which could be merged with an organic condition such as that diagnosed. He was of the opinion that if the question to be determined was the existence of a recidivism, it did not exist, recidivism meaning a prolongation or reactivation of the periostitic condition. He also said that in determining the disability, the hysteria

condition which did not exist at the time of the determination was not taken into account. He said that the laborer's condition was worse, more serious, than that which existed at the time of awarding the disability.

On January 14, 1959 the Commission, "in view of the medical testimony," held "that the condition of conversion reaction presented by the injured was not caused by the alleged accident and that at present he does not present any recidivism," and dismissed the petition. This is the decision under review.

In view of the history revealed by the record, the respondent Commission erred in evaluating and weighing the medical evidence. Approaching the case with such degree of objectivity as is necessary in a situation involving the subsistence and welfare of a laborer who unfortunately sustained a labor accident under a statute affording protection in such cases, and not simply as the clinical problem of interest for the study in this field of neuroses, we would escape the reality of the facts in the record if we concluded that the condition and state of disability of the petitioner at the time his petition was dismissed did not have a direct causal connection with the accident. The doctors said that there was no recidivism from the injury itself as diagnosed, that is, that the condition of periostitis of the femur would have aggravated or augmented. However, the problem presented in this appeal goes considerably farther than that. This is not the case of a laborer who has been cured and resumes his normal activity and later suffers a recurrence or reaggravation of bodily trauma. According to the disclosures of the record, in this case the laborer simply never regained his normal working capacity as a result of the ensuing psychoneurosis, even though the physical injury itself, apparently having no serious consequences, did heal or did not aggravate.

Dr. Cordero's conclusion on the progressive muscular atrophy, loss of mobility, and absence of pain sensation on touch or vibrations, as well as the psychiatrist's conclusion that the reaction of psychoneurotic conversion was a true reality to the laborer, who felt it, and the absence in the record of other details which in these cases help to distinguish an imaginary disease, show that the laborer did not lie or deceive when, since from the start at the different hearings held and before the doctors, he said—in his way of describing this paralysis of neurotic type—that the leg was drying up and dying. Psychiatrist Dr. Flores Gallardo said that the injury was the vehicle which caused the body to displace, in a reaction of conversion hysteria, internal conflicts the bases of which were pre-existing in his opinion. As is the case in medical science, the latter part of this conclusion was based on the assumption that such previous conflicts existed.

The uncontroverted evidence which, in the absence of expression to the contrary, we must presume was believed by the Commission, did not show that this laborer had any conflicts previous to the accident which the psychiatrist assumed existed. This laborer was healthy, worked normally to capacity in a tough job, and made a home with his wife and children. Nothing in the evidence shows that he suffered from any personality disorder, or that he had particular emotional problems other than those one may normally have on the plane in which one's life develops. Nor could it be asserted with absolute certainty that such conflicts of personality or their bases were not pre-existing.

However, it appears from the record with sufficient certainty that even though they existed prior to the accident, according to the medical hypothesis such internal conflicts had not produced in the laborer, until after the accident, disability for work in any degree; and assuming that the emotional conflicts—medical cause of the conversion reaction—pre-

existed, it appears with greater certainty that the accident was the medium or vehicle which precipitated or brought about those conflicts in the hysterical reaction manifested in the organic paralysis which disabled the laborer for work. For the purposes of the applicable law, as we shall see later, such emotional disorders could have pre-existed, or could have developed with the accident itself, or could have arisen for the first time subsequent thereto for any of the many and varied reasons pointed out by the medical and psychological authorities on the matter, and the situation of law would not be altered if the proper causal connection were established between the laborer's state of disability resulting from the paralysis of neurotic type which afflicted him and the labor accident; if there is no feigning of the disease, which as a rule is readily appreciable to the physician. As maintained by the authorities, the medical and psychological cause of the hysteria reaction which is manifested in physical disorders is not as important in this respect as the causal connection between such neurotic reaction and the accident.[1] In referring to the accident, we will not confine ourselves to the injury itself, but to the event which occurred together with all the other surrounding circumstances and facts.

Irrespective of what has been said with respect to the causal factor from the medical standpoint, the medical evidence in the record, duly weighed, does not support either the respondent's conclusion to the effect that the psychiatrist's diagnosis of the laborer's conversion reaction—the disabling organic paralysis of psychological character—had no causal

---

[1] Drs. A. H. Maslow and Béla Mittelmann in their work *Principles of Abnormal Psychology*, 1951 rev. ed. (Library, College of Social Sciences of the U.P.R.), state at pp. 439-43 that the term *"conversion hysteria"* was coined by Fraud to express the idea that in situations of conflicts and tension the patient, instead of having a purely *"psychological"* symptom, presents an appreciable change in an organic function. In other words, they say, that the "psychological" conflict becomes a bodily disturbance. Why is this more common in some individuals than in others, those authors say, is an unsolved problem.

connection with the labor accident. Dr. Cordero concluded that the laborer presented appreciable psychofunctional *changes* following a *traumatic experience.* On the other hand, we believe that we understand what Dr. Flores Gallardo meant when he said that the injury (trauma on the leg) did not cause histeria. Being a psychological and emotional condition, the blow did not cause this neurosis any more than a severe blow or counterstroke to the cranial region would cause the mental deterioration of the intellectual function or of the reasoning by the repercussion of the trauma in the cerebral region. In saying that the blow was not the cause of the conversion reaction, Dr. Flores Gallardo explained in detail that the cause was psychological or emotional, and that that was what he referred to in a medical and psychiatric sense, to the internal conflict. By cause, he was not referring to the concept of causal connection. More clearly stated, he testified that the conversion reaction, clinically, as known by doctors, arose after the trauma.

 The disability produced by post-traumatic neurosis precipitated by an accident or arising thereafter as a result thereof may be compensable, even in those situations in which the accident does not produce bodily trauma, or the physical injury is trivial or may be easily healed. In the term injury there have been included diseases such as traumatic neuroses and hysterical paralyses. Professor Larson says that it has been uniformly held that when there has been a physical accident or trauma and claimant's disability is increased or prolonged by traumatic neurosis or hysterical paralysis, the full disability including the effects of the neurosis is compensable. 1 Larson, The Law of Workmen's Compensation 613–21 (1952), and compiled cases, 1960 Cum. Supp. 216–23. Horowitz, in his book Injury and Death Under Workmen's Compensation Laws (1944), says that traumatic neuroses following physical injuries are almost universally compensated, even though other worries play a

part. Similarly: 5 Schneider, Workmen's Compensation 241–59, and cases commented therein (1946 perm. ed.), and subsequent cases in 1959 Cum. Supp. Vol. III, p. 45: That neurosis, psychoneurosis, and conversion hysteria are very real and may result from industrial accidents has been definitely settled, and when resulting from an accident are compensable, even though other worries may be contributing factors, and even though the physical injury may in itself be trivial or even nonexistent. See, also, what Guttmacher and Weihofen say in their work Psychiatry and the Law—*Psychoneurosis* 49–55 (1952); Dr. Davidson, Forensic Psychiatry 55–63 (1952); Otto Fenichel, The Psychoanalitic Theory of Neurosis-Traumatic Neuroses 117–28 (1945) (Library, College of Social Sciences).

Under a workmen's compensation statute defining "injury" or "personal injury" as the damage or harm *"to the physical structure of the body,"* the Supreme Court of Texas in *Bailey* v. *American General Ins. Co.*, 279 S.W.2d 315 (1955), awarded disability compensation for neurosis resulting from an accident. The workman and a coworker were working on a scaffold suspended eight stories above ground which gave way on the end where the worker stood, and the workman saw him fall and get killed. He did not fall and only suffered a bruise on his leg, which healed promptly and did not cause any disability. He contended that the accident resulted in a neurosis which the doctors termed "anxiety reaction" or "anxiety state." The Supreme Court of that State said that the term "physical structure of the body" refers to the entire body, to the complex of perfectly integrated and interdependent organs which function together by means of electrical, chemical, and mechanical processes in a living and breathing individual, not simply to such or such a system of the body. Compensation was awarded for the disability resulting from such neurosis, even though

the injury in itself, as we have said, was trivial.[2] See other cases compiled in the note and comments on this decision in 34 Texas L. Rev. 496; *Hood* v. *Texas Indemnity Insurance Co.*, 209 S.W.2d 345 (Texas 1948); *Roberts* v. *Dredge Fund*, 232 P.2d 975 (Idaho 1951); *Peavy* v. *Mansfield Hardwood Lumber Co.*, 40 So. 2d 505 (La. 1949), in which the court allowed compensation for a disability resulting from hysteria under a more restrictive statute defining injury as the dam- age *by violence* to the physical structure of the body. *Charon's Case*, 75 N.E.2d 511 (Mass. 1947); *In re Hunnerwell*, 107 N.E. 934 (Mass. 1915); *Burlington Mills Corp.* v. *Hagood*, 13 S.E.2d 291 (Va. 1941); the enlightening opinion in *Miller* v. *United States Fidelity and Guaranty Co.*, 99 So. 2d 511 (La. 1957); *Rialto Lead and Zinc Co.* v. *State Industrial Comm.*, 240 Pac. 96 (Okl. 1925); *Redfern* v. *Sparks-Withington Co.*, 91 N.W.2d 516 (Mich. 1958); *Skelly* v. *Sunshine Mining Co.*, 109 P.2d 622 (Idaho 1941); *O'Neil* v. *Industrial Accident Fund*, 81 P.2d 688 (Mont. 1938); *American Smelting & R. Co.* v. *Industrial Commission*, 123 P.2d 163 (Ariz. 1942).

■ The case of *Murray* v. *Industrial Commission*, 349 P.2d 627 (Ariz. 1960), presents a situation and circumstances having a close resemblance to those in the case at bar. After labor accident and proper treatment for traumatism, the laborer presented a disabling conversion hysterical reaction. The Commission awarded 15 per cent for functional disability. Said the Supreme Court of Arizona:

"... In its findings, the Commission adopted this percentage and likewise adopted the medical conclusion that no causal connection existed as between the injury and the mental condition. Under these circumstances, we do not believe the Commission intended to include disability from hysteria in its 15% disability rating.

"......

[2] The workman stated to the psychiatrist that he had "a narrow escape," and that a few days before an American had met death on that gangplank. Although he was suspended on a cross board of the gangplank, he was afraid that he would fall from an altitude of 25 feet. We do not know what was the emotional effect caused by this.

"We now consider the primary issue presented by this appeal, namely, whether the petitioner's psychoneurosis was produced or aggravated by the injury he sustained as a result of the accident, and if so, whether he was entitled to benefits under the Workmen's Compensation Law. In substance, petitioner states the law to be that where there has been an industrial accident causing physical injury, compensable...and as a result of that injury the workman develops a disabling psychoneurosis, and where the medical history and medical findings (as distinguished from medical opinions or conclusion) demonstrate that such disability was proximately caused by the injury, the Commission should take the mental disease into consideration as well as the physical injury, in making the award.

"On the other hand, the Commission contends that the question of causal relation between injury and disability is peculiarly and necessarily within the singular knowledge of medical experts, and that their unanimous and uncontradicted opinions with respect to causation must be accepted by the Commission; that petitioner's neurosis is not compensable because although it resulted from circumstances arising out of and following the accident, it was not produced or aggravated by the injury suffered."

After reproducing part of the medical testimony setting forth the criteria which are coincident with and very similar to the medical evidence in our case, the Supreme Court concluded that (1) the accident and resulting injury played a role in setting up a sequence which produced the end result of mental disability. The accident was the first event in a long train of things that happened to the personality that ended up in the hysteria; (2) that if the injury had not occurred, the neurotic manifestations would not be present; (3) there definitely was a connection between the back injury and hysteria. The illness "took its coloring" from the accident; (4) petitioner was not afflicted with hysteria or psychiatric disability prior to the accident, and there was no evidence that petitioner's neurosis was precipitated by any event in his life other than the accident; and (5) the external stimulus of the accident and injury, acting upon the partic-

ular personality with which petitioner was endowed, is the event which started or set off the processes by which that personality developed the hysteria. The court added:

"In the opinion of the doctors this injury did not 'cause' the hysteria from a medical point of view. However, what constitutes proximate cause is a legal question primarily, dependent for its answer on the facts of the particular case. In the field of medicine, opinions of doctors qualified by training and experience as to causation are competent, and in many cases controlling and binding upon the trier of facts; however, when the medical facts on which such opinions are based are clearly shown, and the medical opinion as to causation conflicts with inescapable legal conclusion, the former must give way to the latter. The difference in the medical and legal concept of cause results from the obvious differences in the basic problems and exigencies of the two professions in relation to causation. By reason of his training, the doctor is thinking in terms of a single, precise cause for a particular condition. The law, however, endeavors to reach an inference of reasonable medical certainty, from a given event or sequence of events, and recognizes more than one cause for a particular injurious result. ... Likewise, in the field of Workmen's Compensation, the employer takes his employee as he is. In legal contemplation, if an injury, operating on an existing bodily condition or predisposition, produces a further injurious result, that result is caused by the injury."

In stating that in cases of trauma such as that diagnosed to this laborer, accompanied by a symptomatology mingled with the psychofunctional aspect of the condition which he presented, it was difficult to reach a categorical conclusion as to what extent it could be connected, directly or indirectly, with the accident, Dr. Vázquez Milán, correctly laid down the proper course to follow indicating that in such a situation the Commission was bound to decide whether the medical evidence pointed to a hysterical conversion condition which could be connected with the organic condition such as that diagnosed. Evidently, the respondent did not evaluate that situation.

▪▪▪▪ In this field of administrative adjudication, more than in any other, medical science is necessary for the legal disposition of the rights of the parties. However, in the quasi-judicial administrative function as well as later in the judicial function, all the other facts and circumstances which offer other elements of judgment must be weighed together with the scientific elements of judgment offered by the expert evidence, and on the basis of all of them strike a rational balance of the situation in the light of the applicable rules of law for the purpose of adjudicating the rights involved. The adjudication function of administrative agencies in this field is not limited to choosing between a medical conclusion and a preferable conclusion when there is honest discrepancy of medical criteria. Apart from the fact that such action would, to a certain extent, have the involuntary effect of delegating to the experts the judicial adjudication function, it must be borne in mind that, as respects the important and controlling factor of causation between the disabling injury or disease and the labor accident, there is, by exigency of the respective disciplines, a fundamental difference between the concept of cause from the medical standpoint and from the legal standpoint.[3]

▪▪▪▪ In this function of applying the Workmen's Compensation Act, we need not repeat nor support with authorities what constitutes the well-established rule that laws which are remedial in nature must be liberally construed in favor of those sought to be protected, or, as stated in *Spina v. Gahagan Construction Corp.*, 135 A.2d 760 (Pa. 1957), to

---

[3] See authors cited and Ben F. Small, *Gaffing at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation*, 31 Texas L. Rev. 630–59 (1953); Kessler, *Accidental Injuries—The Medico-Legal Aspects of Workmen's Compensation and Public Liability* 605–19 (1941); Medical Trial Technique Quarterly 253–65 (1958 Annual); Hubert W. Smith, *Scientific Proof and Relations of Law and Medicine,* 23 Boston L. Rev. 143; *Traumatic Neuroses in Court*, 30 Va. L. Rev. 87, 138–59; 1 Albert Averbach, Handling Accident Cases. Causation: A Medico-Legal Battlefield 555–81 (1958).

accomplish their broad humanitarian purpose. Specifically, our Workmen's Accident Compensation Act, which is applicable to workmen who suffer injury, *are disabled,* or lose their lives by reason of accidents caused by any act or function inherent in their work, when such accidents occur in the course of said work, adopted by express legislative mandate the undisputed principle in the doctrine and provided that this Act shall be construed liberally, and that any reasonable doubt that may arise as to its application with regard to the existence of *causal relation* between the work or occupation of the workman or employee and the injury, disability or death, or the occupational character of a disease, *shall be decided in favor* of the workman or employee or his beneficiaries. Section 2 of Act No. 45 of 1935 (Sess. Laws, p. 250), as amended by Act No. 94 of June 22, 1957 (Sess. Laws, p. 439). This provision involves the recognition by the lawmaker, for the guidance of the administrative agencies concerned, that it is not always feasible, particularly if there are different medical criteria, to establish with certainty and without room for doubt the legal right to compensation, and that there are areas of reasonable doubt which should not defeat the remedial purposes of the law nor the right to compensation.

It is not our mission, nor would we have the necessary knowledge, to determine with certainty the exact cause of the internal or emotional conflict which as a result of the accident developed in this case the conversion hysteria, within the many medical criteria which could be applied. This is a question for doctors.[4]

---

[4] See authors cited. Cecil G. Baker, *Traumatic Neuroses* (Ins. Counsel J., Jan. 1958); Curran, Law and Medicine. An Anatomy of Trauma—Psychiatric Aspects of Trauma 201–89 (1960); III Lawyers' Medical Encyclopedia 139–74 (1959); Traumatic Psychoneurosis, IV *Id.* 387–394.

Among the recognized causes is the so-called hysteria produced by anxiety or tension because of the compensation or benefits to which the workman is entitled. The disability resulting from this type of hysteria is compensable, if it is real and unconscious to the workman. Dr. Vázquez

We hold that the laborer's state of disability for work precipitated by this psychoneurotic reaction is compensable in the light of the evidence and authorities cited. In remanding the case, the Commission shall determine the compensation according to the prognosis in the record at the time the claim was dismissed, or it may order, since the disturbance is of a psychological character, a medical re-evaluation at the present time and determine the proper compensation.

The order appealed from will be vacated.

Milán evidently suspected that this was the case in recommending a minimum compensation as a means of rehabilitation. We do not even intimate that this is such a case, and, on the other hand, the record does not disclose those symptoms which in the opinion of the authorities would be characteristic of such a type of hysteria.